[No. G041759. Fourth Dist., Div. Three. Aug. 19, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
REYNALDO EID, JR., Defendant and Appellant.

## COUNSEL

George L. Schraer, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Lilia E. Garcia, Meagan J. Beale and Marilyn George, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**IKOLA, J.**—A jury convicted defendant Reynaldo Eid, Jr. (and his codefendant, Alaor Docarmo Oliveira, Jr.), of two counts of kidnapping for ransom for their role in handling two illegal aliens smuggled into the United States (the U.S.). (Pen. Code, § 209, subd. (a) (section 209(a)).)[1] The court sentenced each defendant to concurrent terms of life in prison with the possibility of parole, the lowest possible sentence for kidnapping for ransom.

We conclude that several instructional errors took place in this case. First, CALCRIM No. 1202 on kidnapping for ransom is incomplete because it fails

---

[1] All statutory references are to the Penal Code.

to inform the jury of the People's burden to prove that the victim did not consent to being confined (or another predicate act) and that the defendant did not actually and reasonably believe the victim consented. The court erred by failing to charge the jury sua sponte on the foregoing elements of kidnapping for ransom. Second, the court erred by failing to instruct the jury on the corresponding defenses requested by defendants. Third, the court erred by improperly answering a question asked by the jury during its deliberations. These errors were prejudicial. We therefore reverse the judgment and remand the case for a new trial before a properly instructed jury.

## FACTS

In November 2004, Jefferson Ribeiro came to Florida from Brazil. Upon the expiration of his tourist visa in 2005, he continued to live in Florida, albeit illegally. He and his wife, Ana, decided that Ana and their young son should come to the U.S. illegally from Brazil.[2] Jefferson accepted the offer of an acquaintance, Mauricio Freitas, to have Ana and their son smuggled from Brazil to the U.S. in a five-day trip by plane and car for a price of $18,000. Ana agreed to the plan.

Ana and her son's actual journey from Brazil to the U.S. took about 40 days and included several stops along the way. Ana left Brazil with little or no money. A coyote[3] bought round trip plane tickets from Brazil to Mexico City for Ana and her son. In Mexico City, a man picked them up at the airport and took them to a hotel where they stayed for three days.

Another man moved them to a house near the border where about 40 Brazilians waited to be crossed into the U.S. Ana was not allowed to leave the house. The house's proprietor, a man named Joao, phoned Jefferson to say that Joao had not been paid enough money and that Ana could not travel any further until he was paid. Ana was told that if her "husband didn't send money there was no money to buy food for [her] child." Nonetheless, Ana felt safe at Joao's house. She and her son stayed indoors at that house voluntarily for 10 days.

---

[2] For convenience and to avoid confusion, we refer to members of the Ribeiro family by their first names. We mean no disrespect.

The son was age seven at the time of trial. Ana made decisions on his behalf. (*Parnell v. Superior Court* (1981) 119 Cal.App.3d 392, 402, fn. 3 [173 Cal.Rptr. 906] ["a minor 'is too young to give his legal consent to being taken' "].)

[3] "Coyote" is defined, inter alia, as "one who smuggles immigrants into the U.S." (Merriam-Webster's Collegiate Dict. (10th ed. 2001) p. 268.)

Although Jefferson had paid Freitas (his acquaintance in Florida) a total of $14,000, he did not know whether Freitas had paid Joao any money. Jefferson had lost contact with Freitas, who could not be reached by phone or located at his home in Florida.

Jefferson asked Joao to send his family back to Brazil, and Joao agreed to do so. (Ana and her son had tickets for a return flight to Brazil from Mexico City.) But when Jefferson phoned Joao one or two days later, Joao said Jefferson's family was already in the U.S. Someone phoned Jefferson and told him in Spanish that his family was in California and Jefferson should wait to be contacted by "Junior."

In the meantime, Ana and her son had been taken to another house in Mexico, smuggled across the border hidden under a truck's backseat, brought to yet another house, and then driven across a "military barrier" under the seat of another truck.

Throughout this journey, Ana stayed willingly with her various handlers and transporters because she wanted to come to the U.S. She relied on these people to help her avoid the police. She feared that the police might arrest her and separate her from her son; therefore, she and her son stayed indoors in hotel rooms and houses where they were hidden from the police. Ana willingly relied on the coyotes and accepted their restrictions on what she could and could not do.

After their arrival in the U.S., Ana and her son were taken to a house, then to a nearby gas station. There, they were picked up by Eid and Oliveira in a van driven by Eid. Ana knew Eid as "Junior."

Defendants took Ana and her son to a Travelodge in Costa Mesa, California, where the four of them initially stayed in one room. For "the first days," Ana did not want to go out, fearful the police would arrest her and take her son. She had been told they were waiting for more people to come from Mexico. After another woman (Monica Lino) arrived, the group moved into two rooms with an adjoining door. Ana, her son, and Lino stayed in one room, and defendants in the other. The door between the two rooms was kept open at all times.

Defendants treated Ana and her son well, and paid for the hotel, food, and laundry. They bought milk for the boy and took him to get a haircut. They let Ana talk with Jefferson on Eid's cell phone. There was a telephone in Ana's room. She never saw any weapons.

Jefferson received a phone call from "Junior," who demanded payment of $14,000. Jefferson proposed to pay $1,000 a month. Junior rejected the

proposal, but offered to accept title to a property in Brazil. Jefferson asked his parents to transfer title to their house, but his father refused. Junior then agreed to accept $7,000 and the balance in payments. Jefferson "had no way of paying the [$7,000]."

Junior gave Jefferson the motel's phone number. By phoning the Travelodge, Jefferson learned his family was in Costa Mesa.

On Ana's third day at the Travelodge (Wednesday), Jefferson and Ana spoke to each other on Eid's cell phone. Ana asked why the trip to Florida was taking so long. Jefferson said that defendants "wanted more money so they could release" Ana. Ana became afraid because she knew that she and Jefferson had no more money. Jefferson asked Ana if she could escape. She said she could not because "there was a person with her all the time."

In her mind, Ana felt she did not want to stay with defendants, but instead wanted to go to Florida. She did not feel free to leave, but did not want to contact the police due to her fear of being arrested and separated from her son. She had no money and did not speak English.

The next day (Thursday), defendants told Ana that if Jefferson failed to pay, they would take her to New York so she could work for them to pay off the debt. Eid "grabbed" Ana's passports, and said he needed them to buy plane tickets to Florida.

That day, Jefferson met a man who knew a woman named Vanessa Silva who lived in California. At Jefferson's request, the man phoned and asked Silva and her husband to go to the motel and pick up Jefferson's family if Silva saw them there. Silva was told that Jefferson's wife and son needed a ride to the airport.

Jefferson called Ana's motel room phone and told Ana that two people would come and knock at her door to get her. Defendants knew Ana was talking on the phone to Jefferson. Jefferson never told Ana to contact the police. Silva also phoned Ana's motel room phone and told Ana they would pick her up.

When Ana heard a knock on the door that night, she got up to open it, but Oliveira "caught it and opened the door himself." A man and a woman stood outside. The woman said she had come to get Ana and Ana's son. In the other room, Eid opened the door, went outside, and spoke loudly. Oliveira closed the door of Ana's room and told her to sit and wait.

Sitting on the bed in the room with Oliveira present, Ana asked to leave.[4] Eid was outside "yelling."

Still outside, Eid told Silva "he was owed money and they weren't going anywhere until he got paid." Ana could hear this from inside the room. Ana felt "very afraid." In her mind, she wished she could go with the woman at the door. Eid told Silva and her husband "to stop making trouble" or he would call the police.

Eid went in the room and shut the door, saying, "See, this is what happens every time. Get your stuff ready because we're leaving." Eid screamed at Ana that they "should have never done that, that now he was going to finish with [them], that [they] were in hot water," and they were "going to have the opportunity to know who [he was] in reality, that something real bad [was] going to happen to" them. Ana's son cried. Carrying her son, Ana gathered their belongings.

Meanwhile, Silva and her husband had walked downstairs from the front of the motel where Ana's room was, past the swimming pool and down a back hallway to a side parking lot where Silva's car was parked. Due to Silva's location in the parking lot, she did not see Ana and the others leave the room. Silva called the police on her cell phone.

Inside the room, Oliveira angrily gripped the arms of Lino and Ana (who was holding her son), pushed them out of the room, down the stairs, and toward the van. Ana felt she did not want to stay with defendants. Eid went to the motel lobby to check out.

Defendants pushed Ana, her son, and Lino inside the van, told them to lie on the seat, and told the boy to stop crying. Ana was lying down on the seat as Eid drove the van quickly out of the parking lot. A police car blocked the driveway and stopped the van.

Prior to defendants' trial, Ana and Jefferson entered into immunity agreements immunizing them from prosecution for illegal entry into the U.S. in exchange for their testimony in court. They also hired a lawyer to help them obtain "T-visas" (or trafficking visas), a visa that allows victims of a crime to remain in the U.S.

---

[4] Ana could not recall whether she ever informed the police that she told Eid or Oliveira at any time that she wanted to leave.

## DISCUSSION

Eid contends the court erred by failing to instruct the jury that a defendant is not guilty of kidnapping for ransom (1) if the victim consented to the charged conduct, or (2) if the defendant reasonably believed the victim consented.

*Relevant Law and Jury Instructions on Kidnapping*

■ Under section 209(a), a "person who seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps or carries away another person . . . with intent to hold or detain, or who holds or detains, that person for ransom, reward or to commit extortion or to exact from another person any money or valuable thing" is guilty of kidnapping for ransom. The penalty is either (1) life imprisonment without the possibility of parole if the victim suffers death, bodily harm, or "a substantial likelihood of death," or (2) life imprisonment with the chance of parole in all other cases. (*Ibid.*) Based on this punishment, kidnapping for ransom is "the most serious form of kidnapping" in California.[5] (*People v. Martinez* (1984) 150 Cal.App.3d 579, 587 [198 Cal.Rptr. 565] (*Martinez*), disapproved on another ground in *People v. Hayes* (1990) 52 Cal.3d 577, 628, fn. 10 [276 Cal.Rptr. 874, 802 P.2d 376].) The offense involves a primary victim (who is seized, confined, or otherwise subjected to a predicate act) and a secondary victim (who "is subjected to a ransom or extortion demand"). (*Martinez,* at p. 591; *People v. Ibrahim* (1993) 19 Cal.App.4th 1692, 1696–1698 [24 Cal.Rptr.2d 269] [same person may be both primary and secondary victim].) Kidnapping for ransom does *not* require that the defendant move the victim. (*People v. Rayford* (1994) 9 Cal.4th 1, 12, fn. 8 [36 Cal.Rptr.2d 317, 884 P.2d 1369].) In contrast, California's other forms of kidnapping (simple kidnapping, aggravated kidnapping for robbery or rape, and aggravated kidnapping during carjacking—collectively, "asportation kidnapping") all require movement of the victim. (*Id.* at pp. 11–12, fn. 7.)

CALCRIM No. 1202 (on kidnapping for ransom) never mentions the word "consent" with respect to the primary victim (but rather only with respect to a secondary victim of extortion).[6] But, consistent with section 209(a), it does

---

[5] Kidnapping during carjacking (§ 209.5) carries the same penalty as nonaggravated kidnapping for ransom, i.e., life imprisonment with the possibility of parole.

[6] CALCRIM No. 1202 provides: "The defendant is charged . . . with kidnapping for the purpose of (ransom[,]/ [or] reward[,]/ [or] extortion). . . . [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant (kidnapped[,]/ [or] abducted[,]/ [or] seized[,]/ [or] confined[,]/ [or] concealed[,]/ [or] carried away[,]/ [or] inveigled[,]/ [or] enticed[,]/ [or] decoyed) someone"; "[2. The defendant held or detained that person;]" or "[2. When the defendant acted, (he/she) intended to hold or detain the person;] [¶]

require the People to prove that the defendant "held or detained" a person, or intended to "hold or detain" the person—words that commonly connote a nonconsensual encounter. It further requires the People to prove that the defendant kidnapped, abducted, seized, confined, concealed, carried away, or enticed that person—again, words (with the exception of "concealed" and "enticed") that seem to rule out the primary victim's knowing consent. But CALCRIM No. 1202 reserves its clearest use of nonconsensual words for *aggravated* kidnapping for ransom, requiring the People to prove the defendant used "force or fear" in cases where the kidnapped victim suffers bodily harm or death and for which the perpetrator's penalty is life imprisonment without the possibility of parole.

■ In contrast, the standard instructions on asportation kidnapping—CALCRIM Nos. 1215 (simple kidnapping), 1203 (kidnapping for robbery or rape), and 1204 (kidnapping during carjacking)—each contain more explicit nonconsensual language. Each instruction sets forth elements of the offense requiring the People to prove (1) that the "defendant took, held, or detained another person by using force or by instilling reasonable fear"; (2) that the victim "did not consent to the movement"; *and,* (3) where supported by the evidence, that the "defendant did not actually and reasonably believe that the other person consented to the movement." In addition, these instructions recognize two "defenses" which must be given sua sponte by the court if supported by the evidence. (Judicial Council of Cal., Crim. Jury Instns. (2009–2010) Bench Notes to CALCRIM Nos. 1203, 1204 & 1215, *"Defenses—Instructional Duty."*) These defenses inform the jury that a defendant is not guilty of the respective asportation kidnapping if the victim consented to the movement, or if the defendant reasonably believed the victim consented. The defenses specify that the People bear the burden of proving the victim's lack of consent *and* the defendant's lack of reasonable belief in consent. The asportation instructions further provide that in "order to *consent,* a person must act freely and voluntarily and know the nature of the

---

AND [¶] 3. The defendant did so (for ransom[,]/ [or] for reward[,]/ [or] to commit extortion[,]/ [or] to get money or something valuable). [¶] [It is not necessary that the person be moved for any distance.] [¶] [Someone intends to commit *extortion* if he or she intends to: (1) obtain a person's property with the person's consent and (2) obtain the person's consent through the use of force or fear.]"

The next paragraphs of CALCRIM No. 1202 apply to aggravated kidnapping for ransom, entailing an additional allegation by the People "that the defendant (caused the kidnapped person to (die/suffer bodily harm)/ [or] intentionally confined the kidnapped person in a way that created a substantial risk of death)." As to this additional allegation, the instruction requires the People to prove that the defendant used force or fear to hold or detain the kidnapped person and to begin a foreseeable chain of events that caused the kidnapped person's death or bodily harm. The instruction clarifies that "[b]odily harm means any substantial physical injury resulting from the use of force that is more than the force necessary to commit kidnapping."

act," and that a person may withdraw consent. (CALCRIM No. 1215; see also CALCRIM Nos. 1203, 1204.)[7]

*The Court's Rulings*

In the proceedings below, the court and counsel discussed at length the kidnapping instructions to be given the jury. The discourse began after the close of evidence, when the court announced its intention to instruct the jury sua sponte on simple kidnapping and attempted kidnapping as "lesser-included" offenses of kidnapping for ransom. Defense counsel[8] objected to the instructions on these offenses, based on their tactical decision that the case involved either kidnapping for ransom or "nothing." The court observed that "kidnapping for ransom can result in a life sentence," compared to the "sentencing range of 3, 6, or 8 years" for simple kidnapping and "one-half of that exposure" for attempted kidnapping. In order to forgo instructing on these latter two offenses, the court required a personal waiver from defendants. Eid and Oliveira agreed with their attorneys' request that the judge *not* instruct the jury on simple kidnapping and attempted kidnapping. As a result, the court decided to instruct on only the "three lessers" of false imprisonment by violence, misdemeanor false imprisonment, and attempted extortion.[9]

---

[7] The defenses of consent and reasonable belief in consent are contained in CALCRIM Nos. 1204 (kidnapping during carjacking) and 1215 (simple kidnapping), as follows: "*<Defense: Good Faith Belief in Consent>* [¶] [The defendant is not guilty of kidnapping if (he/she) reasonably and actually believed that the other person consented to the movement. The People have the burden of proving beyond a reasonable doubt that the defendant did not reasonably and actually believe that the other person consented to the movement. If the People have not met this burden, you must find the defendant not guilty of this crime.] [¶] *<Defense: Consent Given>* [¶] [The defendant is not guilty of kidnapping if the other person consented to go with the defendant. The other person consented if (he/she) (1) freely and voluntarily agreed to go with or be moved by the defendant, (2) was aware of the movement, and (3) had sufficient maturity and understanding to choose to go with the defendant. The People have the burden of proving beyond a reasonable doubt that the other person did not consent to go with the defendant. If the People have not met this burden, you must find the defendant not guilty of this crime.] [¶] [Consent may be withdrawn. If, at first, a person agreed to go with the defendant, that consent ended if the person changed his or her mind and no longer freely and voluntarily agreed to go with or be moved by the defendant. The defendant is guilty of kidnapping if after the other person withdrew consent, the defendant committed the crime as I have defined it.]" The last three paragraphs of CALCRIM No. 1203 (kidnapping for robbery or rape) are identical to those above, with the exception that the victim's consent requires the victim to have sufficient "mental capacity to choose to go with the defendant."

[8] References to "defense counsel" pertain to Eid's and Oliveira's attorneys acting in unison.

[9] In fact, simple kidnapping is not a lesser included offense of kidnapping for ransom. (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 368, fn. 56 [68 Cal.Rptr.2d 61] [simple kidnapping not a lesser included offense because kidnapping for ransom "can be accomplished without asportation and the former cannot"].) If simple kidnapping were indeed a lesser included offense of kidnapping for ransom, the court's failure to instruct on simple kidnapping would have been erroneous. A "trial court must, sua sponte, . . . instruct the jury on lesser included offenses 'when the evidence raises a question as to whether all of the elements of the

Defense counsel then asked the court to instruct the jury with CALCRIM No. 1215 (simple kidnapping) to provide the jurors with a definition of kidnapping. Eid's counsel pointed out that, with respect to CALCRIM No. 1202's requirement that the defendants have "kidnapped, abducted, seized, confined, or concealed" a victim, the jury might ask, "What does kidnapped mean?" The court stated, "If they do, then we'll answer the question." The court noted CALCRIM No. 1202's commentary states "there is no need to instruct a jury on the meaning of terms in common usage." Oliveira's counsel argued "kidnapping" is a "term with legal significance." The court declined to give the instruction.

Oliveira's counsel then asked the court to instruct the jury with the last three paragraphs of CALCRIM No. 1215, concerning consent, good faith belief in consent, and withdrawal of consent. The court declined to do so, stating that kidnapping for ransom requires the People "to prove that defendants detained the victims . . . for ransom, which is inconsistent with a consent aspect." The court stated it was not, however, "precluding any argument in this regard."

Accordingly, the court instructed the jury only with CALCRIM No. 1202, as follows: "The defendants are charged in Counts 1 and 2 with *kidnapping* for the purpose of ransom, in violation of . . . section 209(a). [¶] To prove that a defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant *kidnapped,* or abducted, or seized, or confined, or concealed, or carried away, or enticed someone; [¶] 2. The defendant held or detained that person; [¶] and [¶] 3. The defendant did so for ransom. [¶] It is not necessary that the person be moved for any distance." (Italics added.)

During its deliberations, the jury requested a "court definition" of the word "kidnapping." In chambers, defense counsel asked the court to instruct the jurors with the entirety of CALCRIM No. 1215, while the prosecutor requested the court "to direct the jurors back to" CALCRIM No. 1202.

The court proposed giving a modified instruction (the supplemental instruction), consisting of a customized introduction followed by a portion of CALCRIM No. 1215, as follows:

"In response to your question, attached is the legal definition of kidnapping. However, please refer to Instruction No. 1202 . . . .

---

charged offense were present [citation], but not when there is no evidence that the offense was less than that charged.' " (*People v. Barton* (1995) 12 Cal.4th 186, 194–195 [47 Cal.Rptr.2d 569, 906 P.2d 531].) This is true even when the defendant, " ' "as a matter of trial tactics," ' " objects to or expressly waives the instruction. (*People v. Golde* (2008) 163 Cal.App.4th 101, 115 [77 Cal.Rptr.3d 120].)

"To be guilty of kidnapping for ransom, the People must prove beyond a reasonable doubt that:

"1. The defendant kidnapped or abducted or seized or confined or concealed or carried away or enticed someone;

"2. The defendant held or detained that person; AND

"3. The defendant did so for ransom.

"Element No. 1 only requires one of the alternative actions.

"To prove kidnapping, the People must prove that:

"1. The defendant took, held, or detained another person by using force or by instilling reasonable fear;

"2. Using that force or fear, the defendant moved the other person or made the other person move a substantial distance;

"AND

"3. The other person did not consent to the movement . . .

"AND

"4. The defendant did not actually and reasonably believe that the other person consented to the movement.

"In order to consent, a person must act freely and voluntarily and know the nature of the act.

"Substantial distance means more than a slight or trivial distance. In deciding whether the distance was substantial, you must consider all the circumstances relating to the movement. Thus, in addition to considering the actual distance moved, you may also consider other factors such as whether the movement increased the risk of physical or psychological harm, increased the danger of a foreseeable escape attempt, gave the attacker a greater opportunity to commit additional crimes, or decreased the likelihood of detection."

Thus, the supplemental instruction stated that the elements of lack of consent, or lack of reasonable belief in consent, apply only to the *movement* of the victim, not to the other potential predicate acts of kidnapping for

ransom. Defense counsel objected to the proposed supplemental instruction. Eid's counsel argued the court could not answer the jury's question on the definition of kidnapping without giving CALCRIM No. 1215 in its entirety, including the defenses. He also asked the court *not* to give the paragraph of the introduction, which stated that kidnapping for ransom requires only one of the alternative predicate acts. He contended the jury was *not* asking, "Do the People have to prove kidnap? Or, can they go on some alternative argument such as abducted, seized, or confined?" Rather, in his view, the jury was "simply saying, define kidnapping." Oliveira's counsel agreed that the introduction answered a question the jury had not asked. He argued the defenses of consent and good faith belief in consent contained in CALCRIM No. 1215 "are a necessary part of the definition"; otherwise, defendants' defense would be "impaired."

The court disagreed, ruling as a matter of law that consent and good faith belief in consent are defenses to simple kidnapping, *not* to kidnapping for ransom. The court further ruled that defendants and their counsel had made a strategic decision that the jury not be instructed on simple kidnapping. Accordingly, the court provided the jurors with a written copy of the supplemental instruction (without the modifications requested by defense counsel).

After the jury rendered its verdict, defendants moved for a new trial, arguing the case was a close one, with the jury deliberating for "around nine hours," and that in response to the jury's request for a definition of "kidnapping," the court had misdirected "the jury's deliberations away from [their] train of thought . . . to a direction that the court felt they should be going."[10] Oliveira's counsel argued "the jurors should have been instructed on the defenses of consent and good faith belief in consent" "because that was our entire defense," and because, under "the circumstances of this particular case, defenses of consent and good faith consent were absolutely defenses to kidnap for ransom." The court denied defendants' new trial motion.

*The Contentions on Appeal*

Eid contends the court erred by denying his request for jury instructions on the defenses of the primary victim's consent to the charged conduct, and a defendant's reasonable belief that the victim consented. He argues the court also erred by refusing to charge the jury on these defenses when the jurors, during deliberation, asked the court to define kidnapping.

---

[10] Oliveira's counsel noted "the jury initially signed not guilty forms on the life count in this case and then changed them." The court stated the "cross-out" might have been "a clerical error."

The Attorney General counters that defendants invited any error; that consent is not a defense to kidnapping for ransom; that CALCRIM No. 1202 adequately instructs on lack of consent; that the evidence did not support the defenses; and that any error was harmless.

### 1. Defendants did not invite the errors

The Attorney General argues defendants invited any error by objecting to the court instructing the jury on simple kidnapping as a lesser included offense of kidnapping for ransom. The contention lacks merit. Defendants did *not* invite the court to refuse to instruct the jury on the defenses to kidnapping for ransom. Nor did defendants invite the court to provide the jurors with an incomplete and misleading answer to their question on the definition of "kidnapping." We therefore address Eid's contentions on the merits.

### 2. Lack of consent is an element of kidnapping for ransom (as is lack of reasonable belief in consent, when supported by the evidence)

Before addressing Eid's contention that the court should have instructed the jury on the defenses of consent and reasonable belief in consent, we must first consider whether the primary victim's lack of consent is indeed an element of kidnapping for ransom. The Attorney General argues "the use of force or fear is not an element of non-aggravated kidnapping for ransom," nor is the victim's mental state an element of the crime.

██ Whether the primary victim's lack of consent is an element of kidnapping for ransom is apparently an issue of first impression. Section 209(a) does not *expressly* require the use of force or fear by the perpetrator, or any particular mental state of the victim.

To determine whether the Legislature intended section 209(a) to encompass situations where the primary victim has consented to the defendant's acts, we independently interpret the statute and look first to its plain language. (*People v. Watson* (2007) 42 Cal.4th 822, 828 [68 Cal.Rptr.3d 769, 171 P.3d 1101].) The words "hold or detain" would seem to connote force or compulsion, as do the predicate acts, "seizes," "confines," and "abducts." But "hold" and "detain" can also mean to delay (Webster's 3d New Internat. Dict. (2002) pp. 616, 1078), which can be consensual. For example, an illegal immigrant might consent to being delayed in her trip to her ultimate destination. "[T]hese words suggest nothing about the necessity for the confinement to have some character, temporal or otherwise," such as whether the holding

must be in an isolated place.[11] (3 LaFave, Substantive Criminal Law, *supra*, § 18.1(c), pp. 14–15.) Likewise, the predicate acts "conceal" and "entice" are compatible with consent, as where an illegal immigrant is concealed from the authorities or enticed by the promise of entry to the U.S. The predicate acts "inveigle" and "decoy" connote deception, but not force or fear; they are, however, inconsistent with a victim's *knowing* consent.[12] In any case, the language of section 209(a) does not convey compulsion as plainly as does section 207, subdivision (a) on simple kidnapping (which applies to a "person who forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests" a person and carries the person into another location). Thus, section 209(a)'s language, standing alone, does not answer the question of whether lack of consent is an element of kidnapping for ransom.

We thus turn to the extrinsic aid of the statutory scheme of which section 209(a) is a part. (*People v. Cole* (2006) 38 Cal.4th 964, 975 [44 Cal.Rptr.3d 261, 135 P.3d 669].) As discussed above, asportation kidnapping has been interpreted to require the victim's lack of consent. (See *People v. Davis, supra,* 10 Cal.4th at pp. 516–518; CALCRIM Nos. 1203, 1204, 1215.) It would be

---

[11] "Detention" in this context has been "interpreted broadly by the courts." (3 LaFave, Substantive Criminal Law (2d ed. 2009) § 18.1(a), p. 5.) "[B]y the time the Model Penal Code was drafted [in 1980], . . . a great many kidnapping statutes 'combined severe sanctions with extraordinarily broad coverage, to the effect that relatively trivial restraints carried authorized sanctions of death or life imprisonment.' " (*Ibid.*)

In criminal case law, "detention" often refers to a temporary stop. (5 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Criminal Trial, § 106, p. 179.)

In *Martinez, supra,* 150 Cal.App.3d 579, the Court of Appeal focused on the meaning of " 'seizes' and 'confines,' " and found these terms were "not elucidated in the few cases that discuss kidnapping for ransom . . . ." (*Id.* at p. 599.) *Martinez* concluded seizure or confinement for purposes of kidnapping for ransom requires the perpetrator to take physical control of the victim through the use of force and fear. (*Martinez,* at pp. 599–600.) In a footnote, the appellate court stated, "if 'holds or detains' carries some meaning beyond that conveyed by 'seizes or confines,' the difference has no application to this case." (*Id.* at p. 599, fn. 11.)

[12] The Attorney General argues that a victim may be held or detained "without the victim's knowledge." As an example, they postulate that one "could commit the crime by enticing a young adult with alcohol, and entertaining the victim with . . . video games or other entertainment, while holding or detaining the victim without the victim's knowledge . . . while ransom was sought from another." As another example, the Attorney General theorizes that a victim could be asleep in a room while a guard stands outside and seeks ransom from another person.

Consent, however, operates as a defense to an asportation kidnapping only if the victim is aware of the movement. (*People v. Davis* (1995) 10 Cal.4th 463, 517 [41 Cal.Rptr.2d 826, 896 P.2d 119].) By correlation, consent to kidnapping for ransom should similarly require the victim's knowledge that he or she is being held or detained. Assuming the words "hold or detain" necessarily connote the use of force or fear, it would be a question of fact for the jury whether the provider of refreshments and entertainment intended to hold or detain the victim by use of force or fear if necessary.

anomalous if the most severe form of kidnapping in California, i.e., kidnapping for ransom, had no such requirement (unless consent has a unique connection to asportation—a point we discuss below). Also relevant to our analysis is the existence of other, less serious statutory offenses which may apply to the behavior at hand, even when the primary victim has consented to the confinement or concealment. For example, section 210 of the statutory scheme on kidnapping sets forth the felony of extortion "by posing" as a kidnapper, punishable by imprisonment for two, three or four years. Section 210 does not "require[] the purported kidnap victim to have been actually" kidnapped. (*People v. Alday* (1973) 10 Cal.3d 392, 394 [110 Cal.Rptr. 617, 515 P.2d 1169].) Another potentially applicable crime resulting in more graduated punishment is section 518 on extortion, also punishable by imprisonment for two, three or four years (§ 520). And under federal law, the "[b]ringing in and harboring [of illegal] aliens" (8 U.S.C. § 1324, boldface omitted) is a crime punishable by fine, imprisonment for "not more than 10 years, or both" (*id.*, § 1324(a)(1)(B)(i)).[13]

Finally, we consider the extrinsic aids of "the ostensible objects to be achieved, the evils to be remedied, the legislative history, [and] public policy . . . ." (*People v. Woodhead* (1987) 43 Cal.3d 1002, 1008 [239 Cal.Rptr. 656, 741 P.2d 154].) It has been stated that "[p]erhaps no modern crime is as deeply and inescapably attached to its historical basis as is kidnaping for pecuniary purposes, and any adequate analysis of the offense necessarily must be based upon thorough understanding and appreciation of that background." (*People v. Knowles* (1950) 35 Cal.2d 175, 193 [217 P.2d 1] (dis. opn. of Edmonds, J.) (*Knowles*).)

Prior to 1933, section 209 required "that the acts [underlying kidnappings for ransom] be done 'maliciously, forcibly or fraudulently,' " as opposed to " 'with intent to hold or detain.' " (*Knowles, supra,* 35 Cal.2d at p. 192 (dis. opn. of Edmonds, J.).) In 1932, in response to "an alarming rate of kidnappings for ransom . . . , culminating in the infamous Lindbergh kidnapping,"

---

[13] Eid also directs our attention to the offense of false imprisonment (§§ 236, 237), arguing that although no case has "squarely [held] that consent is a defense to false imprisonment, it is clear that" this is so. He contends false imprisonment is a lesser included offense of kidnapping for ransom and concludes consent is therefore a defense to kidnapping for ransom. The Attorney General argues it "is not so clear" that false imprisonment is a lesser included offense of kidnapping for ransom, acknowledging that although courts "have reflexively stated" this, some of these cases involved other forms of kidnapping. The cases cited by Eid simply state, without analysis, that false imprisonment is a lesser included offense of kidnapping. (*People v. Morrison* (1964) 228 Cal.App.2d 707, 713 [39 Cal.Rptr. 874]; *Martinez, supra,* 150 Cal.App.3d at pp. 598–599; *People v. Straight* (1991) 230 Cal.App.3d 1372, 1374 [282 Cal.Rptr. 10]; *People v. Chacon* (1995) 37 Cal.App.4th 52, 65 [43 Cal.Rptr.2d 434]; *People v. Greenberger, supra,* 58 Cal.App.4th at pp. 314, 380; see also *People v. Moreland* (1970) 5 Cal.App.3d 588, 594 [85 Cal.Rptr. 215].)

Congress enacted "the Federal Kidnapping Act, commonly called the Lindbergh Law . . . ." (*People v. Ordonez* (1991) 226 Cal.App.3d 1207, 1226 [277 Cal.Rptr. 382].) By that time, kidnapping "had become an epidemic in the United States. Ruthless criminal bands utilized every known legal and scientific means to achieve their aims and to protect themselves. Victims were selected from among the wealthy with great care and study." (*Knowles, supra,* 35 Cal.2d at p. 195 (dis. opn. of Edmonds, J.).) In 1933, "the California Legislature amended section 209" (*ibid.*), omitting the element of asportation and increasing "the penalty to death or life imprisonment without the possibility of parole if the victim suffered bodily harm" (*Ordonez,* at p. 1226). The purpose of the augmented penalty was to deter the kidnapper " 'from harming his victim, to induce him to release the victim unharmed.' " (*Ibid.*) The amendment " 'enlarge[d] the definition of kidnapping . . . by deleting the [then] existing requirement that the seizure or carrying away must be done maliciously, forcibly or fraudulently, and includ[ing] within the definition one who aids or abets.' " (*Knowles,* at p. 200.) Thus, the 1933 amendment of section 209 broadened the scope of the offense and stiffened the penalty in order to deter a proliferation of kidnappings for ransom (a crime harmful to primary and secondary victims).[14]

Toward that end, did the Legislature intend the crime to be broad enough to cover consensual behavior on the part of a primary victim? We think not. Section 209(a)'s severe penalties of life imprisonment with or without parole are sensible only because kidnapping for ransom is "an offense inherently dangerous to human life." (*People v. Ordonez, supra,* 226 Cal.App.3d at p. 1228.) Although kidnapping for ransom does not require asportation (which carries innate risk of harm), it "has other features that heighten the danger to the victim." (*Ibid.*) " '[K]idnapping for ransom inherently presents a combination of factors creating a substantial risk of bodily harm. In the ransom situation, "forcible control is necessary to effect secret confinement; the offense requires a protracted concealment; the confinement becomes more difficult to maintain when the kidnapper's flight ultimately becomes necessary; and the victim's release grows increasingly dangerous with the passage of time." Accordingly, a demand for ransom generally involves an express or an implied threat of death or great bodily harm.' " (*Ibid.*)

The foregoing passage describes the classic ransom situation in which a primary victim is forcibly controlled. In contrast, when a primary victim freely and knowingly consents to stay with a perpetrator, force is unnecessary; thus the primary victim is less likely to suffer bodily harm. In that

---

[14] Kidnapping for ransom is also broader than simple kidnapping in that it covers situations where a primary victim is inveigled or decoyed. In contrast, "asportation by fraud alone does not constitute general kidnapping in California." (*People v. Davis, supra,* 10 Cal.4th at p. 517, fn. 13.)

situation, the secondary victim, whose money or other property is the object of the criminal enterprise, is still at risk of pecuniary harm. In our view, a defendant who poses a risk of harm only to the secondary victim may be guilty of other crimes (such as extortion, extortion by posing as a kidnapper, or bringing in and harboring aliens—8 U.S.C. § 1324), but not of kidnapping for ransom with its mandatory penalty of life imprisonment.

■ We conclude that the primary victim's lack of consent is an element of kidnapping for ransom. In addition, the lack of a defendant's reasonable belief in consent is an element of kidnapping for ransom when suggested by the evidence. (See *People v. Isitt* (1976) 55 Cal.App.3d 23, 28 [127 Cal.Rptr. 279] [kidnapping for robbery]; § 26 [mistake of fact]; CALCRIM Nos. 1203, 1204 & 1215.) The law on asportation kidnapping has treated this element as applicable (such that the jury should be instructed on it), where it is supported by "some evidence 'deserving of . . . consideration.' " (*People v. Mayberry* (1975) 15 Cal.3d 143, 157 [125 Cal.Rptr. 745, 542 P.2d 1337].) We see no reason to diverge from traditional kidnapping law in this respect. The People should not be required to prove this element in cases where it is not genuinely at issue.

3. *The court erred by failing to instruct the jury on the elements of lack of consent and lack of defendants' reasonable belief in consent, and on the corresponding defenses requested by defendants*

■ CALCRIM No. 1202 fails to clearly inform the jury that, to prove a defendant guilty of kidnapping for ransom, the People must prove, inter alia, (1) that the victim did not consent to the confinement, concealment, or other predicate act, and (2) where applicable, that the defendant did not actually and reasonably believe that the victim consented to the predicate act. CALCRIM No. 1202 also fails to instruct the jury on the corresponding "defenses"—i.e., that the defendant is not guilty if the primary victim consented to the predicate act or if the defendant reasonably believed the victim consented, *and* that the People still bear the burden of proving the elements that these defenses negate.[15]

■ Thus, although the court read to the jury CALCRIM No. 1202, the pattern instruction does not adequately inform a jury of the law on kidnapping for ransom. A court has a sua sponte duty to charge the jury on the essential elements of the crime. (*People v. Flood* (1998) 18 Cal.4th 470, 504

---

[15] Neither of these "defenses" is an affirmative defense. " '[T]he state may not label as an affirmative defense a traditional element of an offense and thereby make a defendant presumptively guilty of that offense unless the defendant disproves the existence of that element.' " (*People v. Neidinger* (2006) 40 Cal.4th 67, 74 [51 Cal.Rptr.3d 45, 146 P.3d 502].)

[76 Cal.Rptr.2d 180, 957 P.2d 869].) Here, the court should have instructed the jury on the People's burden to prove that Ana did not consent to the charged conduct.

■ Whether the court should have instructed the jury on the *conditional element* of lack of reasonable belief in consent, as well as on the *defenses* of consent and reasonable belief in consent (as requested by defendants),[16] depends on the sufficiency of the evidentiary support. A "criminal defendant is entitled to adequate instructions on the defense theory of the case" if supported by the law and evidence (*Conde v. Henry* (9th Cir. 1999) 198 F.3d 734, 739) and " 'has a constitutional right to have the jury determine every material issue presented by the evidence . . .' " (*People v. Lewis* (2001) 25 Cal.4th 610, 645 [106 Cal.Rptr.2d 629, 22 P.3d 392]). "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, *Chambers* v. *Mississippi* [(1973) 410 U.S. 284, 294 [35 L.Ed.2d 297, 93 S.Ct. 1038]], or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, [citations], the [federal] Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.' " (*Crane v. Kentucky* (1986) 476 U.S. 683, 690 [90 L.Ed.2d 636, 106 S.Ct. 2142].) Under state law, the Penal Code mandates that, if a party asks the court to charge the jury on the law (rather than on matters of fact), and the charge is correct and pertinent, the court must give the instruction. (§§ 1093, subd. (f), 1127.) A "court should instruct the jury upon every material question upon which there is any evidence deserving of any consideration whatever." (*People v. Burns* (1948) 88 Cal.App.2d 867, 871 [200 P.2d 134]; see also 5 Witkin & Epstein, Cal. Criminal Law, *supra*, Criminal Trial, § 607, p. 866.) And, when a defendant requests instructions on a legally correct defense, the charge must be given if it is supported by evidence " ' "sufficient to raise a reasonable doubt" ' " if believed by the jury. (*People v. Mentch* (2008) 45 Cal.4th 274, 288 [85 Cal.Rptr.3d 480, 195 P.3d 1061].) " 'Doubts as to the sufficiency of the evidence to warrant instructions should be resolved in favor of the accused.' " (*People v. Flannel* (1979) 25 Cal.3d 668, 685 [160 Cal.Rptr. 84, 603 P.2d 1], superseded by statute on another point as stated in *In re Christian S.* (1994) 7 Cal.4th 768 [30 Cal.Rptr.2d 33, 872 P.2d 574].)

---

[16] The record supports a conclusion that defendants asked the court to instruct the jury on consent and reasonable belief in consent as defenses to kidnapping for ransom (with respect to all its predicate acts), not simply as defenses to the predicate act of simple kidnapping. Although the pertinent paragraphs of CALCRIM No. 1215 refer to the victim's consent to "the movement," the court and counsel never reached the stage of modifying, as necessary, the language of the instruction to be given. No stand-alone CALCRIM instruction exists on these defenses to kidnapping. Two freestanding CALJIC instructions which focused on these defenses to asportation kidnapping (CALJIC Nos. 9.56 [No Kidnapping When Free Consent], 9.58 [Kidnapping—Belief as to Consent]) were incorporated into the standard CALCRIM instructions on asportation kidnapping, as discussed above.

Thus, the pertinent inquiry is whether the instructions on the conditional element of defendants' lack of reasonable belief in consent, and the defenses of consent and reasonable belief in consent, were supported by sufficient evidence. We conclude the evidence, viewed in defendants' favor, was sufficient (1) to support the defense theory that the People failed to prove defendants did not actually and reasonably believe Ana consented to the charged conduct, and (2) to raise a reasonable doubt whether Ana consented to stay with defendants, or whether defendants reasonably and in good faith believed she did.

The record is replete with evidence of Ana and Jefferson's overriding desire to reunite their family in Florida. Based on this strong motivation, Ana and Jefferson tolerated delays, uncertainty, and danger. Throughout her long journey to the U.S., Ana acquiesced to restrictions imposed on her and her son by strangers of questionable character. Ana and Jefferson relied on the coyotes to conceal her and the child from the authorities. Ana voluntarily hid inside houses, hotels, and truck seats. The son cried when coyotes told him to hide under a truck seat and not to move or speak. He cried when guards locked Ana and him in a room in a house in the U.S. But despite her son's distress, Ana consented to these confinements. She tolerated the "problems" that arose and knowingly put herself at the mercy of the transporters. She voluntarily stayed at Joao's house in Mexico even after Joao demanded money from Jefferson and threatened to withhold food from her son.

Once in the U.S., Ana wanted to reach her destination in Florida. Jefferson never asked defendants to send his family back to Brazil from the U.S. He did not tell Ana to phone the police, nor did Ana ask Jefferson to call the police. Defendants allowed Jefferson to communicate with Ana and even gave him the Travelodge's phone number. By phoning that number, Jefferson knew where his family was located. Defendants did not try to hide Ana and her son from Jefferson, unlike the typical kidnapping for ransom situation. (3 LaFave, Substantive Criminal Law, *supra*, § 18.1(c), pp. 15–17.)

At the Travelodge, Ana did not try to leave her room or to call for help even though the walkway outside her room overlooked a busy street. She did not try to lock the adjoining door between the two rooms, even though there was a dead bolt. She had no money, did not speak English, and wanted (above all) to avoid the police. On Thursday morning, defendants told Ana they would buy plane tickets for her. Although Ana eventually did not want to be with defendants, neither did she wish to be with the police or on her own and penniless in an unfamiliar place. Rather, she testified she wanted to be in Florida. But until that option became available, the jury might have inferred Ana chose to stay with defendants.

The only time interval when no substantial evidence supports Ana's consent to stay was when Silva was at the motel room door. But we do not know, and we cannot assume, that the jury based its conviction of defendants on this brief moment in time. Moreover, substantial evidence does support defendants' possible reasonable belief that Ana still consented to stay during those minutes. There was no evidence defendants knew who Silva was or that she had been sent by Jefferson. Eid even threatened to phone the police. Although Ana testified she told Oliveira she wished to leave, she admitted she was unsure whether she ever told the police that she had made such a statement. Eid, being outside when Ana made the statement, might not have heard it.

After Silva disappeared downstairs, substantial evidence shows that Ana may have voluntarily gone to the van with defendants. Ana may not have known Silva was still on the premises. Ana had heard Silva threaten to phone the police. Ana testified she would have been frightened if Silva or Eid had called the police. Ana never told the police that defendants forced her to go to the van. On the way to the van she did not scream for help or try to call attention to herself. She saw no weapons on defendants. She hid in the van. When the police stopped the van, Ana's greatest fear was that they would arrest her. This evidence is sufficient to raise a reasonable doubt about whether Ana chose to stay with defendants after Silva disappeared downstairs.

In addition, substantial evidence showed Jefferson and Ana's potential motivation to lie. They had been granted immunity for their testimony and also hoped to acquire a "T-visa" if defendants were convicted of a crime.

■ In sum, sufficient evidence supports the lack of reasonable belief in consent and the defenses of consent and reasonable belief in consent. The court should have sua sponte instructed the jury on the elements of lack of consent and lack of reasonable belief in consent, and granted defendants' request for jury instructions on the corresponding defenses.[17]

4. *The court erred by instructing the jury only on simple kidnapping in response to the jurors' question and by deleting a portion of CALCRIM No. 1215*

■ When a jury asks a question after retiring for deliberation, "[s]ection 1138 imposes upon the court a duty to provide the jury with information the

---

[17] Eid directs our attention to cases like *People v. Camden* (1976) 16 Cal.3d 808 [129 Cal.Rptr. 438, 548 P.2d 1110] on withdrawal of consent. Had the court instructed on the defenses of consent and reasonable belief in consent, it should have also charged the jury on withdrawal of consent if requested by a party. (Judicial Council of Cal., Crim. Jury Instns., *supra*, Bench Notes to CALCRIM No. 1215, *"Defenses—Instructional Duty."*)

jury desires on points of law." (*People v. Smithey* (1999) 20 Cal.4th 936, 985 [86 Cal.Rptr.2d 243, 978 P.2d 1171].) But "[t]his does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information." (*People v. Beardslee* (1991) 53 Cal.3d 68, 97 [279 Cal.Rptr. 276, 806 P.2d 1311].) We review for an abuse of discretion any error under section 1138. (*People v. Waidla* (2000) 22 Cal.4th 690, 746–747 [94 Cal.Rptr.2d 396, 996 P.2d 46].)

The jury asked the court to define "kidnapping." The word "kidnapping" appears only once in CALCRIM No. 1202 as it was read to the jury: the instruction states the defendant is charged with "kidnapping for ransom." The word "kidnapped" subsequently appears as one of the predicate acts. Although defendants argued the jury was not necessarily asking for a definition of kidnapping as one of the predicate acts to kidnapping for ransom, the court instructed the jury only on simple kidnapping and stressed to the jurors they could convict defendants on any other predicate act standing alone. The court thereby implied that the element of lack of consent (which the People must prove beyond a reasonable doubt) applies only when kidnapping for ransom is based on the predicate act of moving the victim a substantial distance. The court compounded the error by giving the jury a truncated version of CALCRIM No. 1215 (with the defenses deleted) so that the jury was never informed that a victim's consent and a defendant's reasonable belief in consent are defenses to simple kidnapping. Thus, the court's answer misled the jurors and did not provide them with the information they requested.

### 5. *The errors were prejudicial*

The court's failure under section 1138 to adequately answer the jury's question "is subject to the prejudice standard of *People v. Watson* [(1956)] 46 Cal.2d 818, 836 [299 P.2d 243]," i.e., whether the error resulted in a reasonable probability of a less favorable outcome. (*People v. Roberts* (1992) 2 Cal.4th 271, 326 [6 Cal.Rptr.2d 276, 826 P.2d 274].) In this context, "reasonable probability" means " 'merely a *reasonable chance*, more than an *abstract possibility*,' of an effect of this kind." (*People v. Blakeley* (2000) 23 Cal.4th 82, 99 [96 Cal.Rptr.2d 451, 999 P.2d 675].)

A trial court's failure to instruct on all elements of an offense is a constitutional error "subject to harmless error analysis under both the California and United States Constitutions." (*People v. Flood, supra,* 18 Cal.4th at p. 475.) Under the federal Constitution, the standard is whether the instructional error was harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]. (*Flood,* at p. 504.)

The test for prejudice from the court's failure to instruct the jury on defendants' requested defenses is less clear. (See, e.g., *People v. Gonzales* (1999) 74 Cal.App.4th 382, 390, 391 [88 Cal.Rptr.2d 111] ["We need not determine . . . the applicable standard of prejudice" for failure to instruct on a defense that "negates proof of an element of the charged offense."]; *People v. Rogers* (2006) 39 Cal.4th 826, 868, fn. 16 [48 Cal.Rptr.3d 1, 141 P.3d 135] [exception to *Watson* standard may exist "when the error deprives the defendant of the federal due process right to present a complete defense"]; *People v. Russell* (2006) 144 Cal.App.4th 1415, 1431 [51 Cal.Rptr.3d 263] ["Error in failing to instruct on the mistake-of-fact defense is subject to" *Watson* test.].)

In determining whether instructional error was harmless, relevant inquiries are whether "the factual question posed by the omitted instruction necessarily was resolved adversely to the defendant under other, properly given instructions" (*People v. Flood, supra,* 18 Cal.4th at p. 485) and whether the "defendant effectively conceded the issue" (*id.* at p. 504). A reviewing court considers "the specific language challenged, the instructions as a whole[,] the jury's findings" (*People v. Cain* (1995) 10 Cal.4th 1, 35–36 [40 Cal.Rptr.2d 481, 892 P.2d 1224]), and counsel's closing arguments to determine whether the instructional error "would have misled a reasonable jury . . ." (*id.* at p. 37).

The errors here were cumulative and prejudicial under either the *Chapman* or *Watson* standard. The court's failure to charge the jury on the elements of lack of consent and lack of reasonable belief in consent (and the corresponding defenses, which more fully explain such elements) precluded the jurors from considering whether Ana stayed with defendants by her own volition or whether defendants actually and reasonably believed she did. This error was never cured. The Attorney General points us to no other jury instructions, jury findings, or counsel's arguments showing the jurors knew they had to acquit defendants of kidnapping for ransom if the People failed to prove beyond a reasonable doubt that Ana did not consent to the predicate act or defendants did not reasonably believe she did. In his closing argument, the prosecutor described three elements of kidnapping for ransom, but did not mention the issue of whether Ana consented to being confined. Defendants never conceded the issue; to the contrary, based on their counsel's closing arguments, their defense was that Ana consented to stay with them; that Ana, Jefferson and Silva lacked credibility in claiming otherwise; and that defendants reasonably believed Ana consented to stay. The supplemental instruction advised the jury of the People's burden to prove that Ana did not consent to being *moved* and that defendants did not reasonably believe Ana consented to being *moved*. But because the supplemental instruction was emphatically limited to simple kidnapping, the jurors were never asked to decide whether Ana consented to being confined, concealed or any other predicate act

(besides being moved), or whether defendants reasonably believed Ana consented to any predicate act(s) (other than movement). We cannot glean from the verdict on what basis the jury convicted defendants, i.e., whether the jurors found defendants confined, concealed, moved, took some other predicate action, or any combination thereof. The cumulative instructional errors impaired defendants' ability to present a complete defense. There is a reasonable chance these errors resulted in a less favorable outcome for defendants.

## DISPOSITION

The judgment is reversed and the case remanded for a new trial before a jury instructed in accordance with the views expressed in this opinion.

O'Leary, Acting P. J., and Aronson, J., concurred.