Filed 6/12/13  (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>REYNALDO JUNIOR EID et al.,<br><br>    Defendants and Appellants. | G046129<br><br>(Super. Ct. No. 05HF2101)<br><br>ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING; NO CHANGE IN JUDGMENT |

It is ordered that the opinion filed herein on May 22, 2013, be modified as follows:  At the end of the last paragraph on page 12, delete the following:

(See *People v. Powell* (2013) 214 Cal.App.4th 106, 109 ["error was prejudicial because it allowed the jury to convict Powell of an offense of which he had no reasonable notice"].)

There is no change in the judgment.

The petition for rehearing is DENIED.

Filed 5/22/13 (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G046129 |
| v. | (Super. Ct. No. 05HF2101) |
| REYNALDO JUNIOR EID et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeal from a judgment of the Superior Court of Orange County, M. Marc Kelly, Judge.  Reversed in part and affirmed in part with modifications.

Richard J. Moller, under appointment by the Court of Appeal, for Defendant and Appellant Reynaldo Junior Eid.

Siri Shetty, under appointment by the Court of Appeal, for Defendant and Appellant Alaor Docarmo Oliveira, Jr.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Melissa Mandel, Deputy Attorney General, for Plaintiff and Respondent.

1

In two prior opinions (*People v. Eid* (2010) 187 Cal.App.4th 859; *People v. Oliveira, Jr.* (Aug. 19, 2010, G042004) [nonpub. opn.]), we reversed the kidnapping for ransom convictions of defendants Reynaldo Junior Eid and Alaor Docarmo Oliveira, Jr., respectively, for instructional error.  Defendants' convictions arose from their joint role in handling two undocumented immigrants smuggled into the United States (the U.S.).

On retrial, the People again charged defendants with two counts each of kidnapping for ransom.  (Pen. Code, § 209, subd. (a).)[1]  The jury acquitted each defendant of kidnapping for ransom, but convicted each of them, as to each count in the information, of the *two* lesser included offenses of felony attempted extortion (§§ 664, subd. (a), 518) and misdemeanor false imprisonment (§§ 236, 237, subd. (a)).  The court sentenced each defendant on count 1 to two years for attempted extortion and a consecutive one-year term for false imprisonment, and on count 2 to a consecutive six months for attempted extortion and a consecutive one-year term for false imprisonment, resulting in a total term of four years and six months for each defendant.

On appeal, defendants contend the jury improperly convicted them of *two* uncharged lesser included offenses for each charge of kidnapping for ransom.  We agree and therefore strike defendants' convictions for misdemeanor false imprisonment.  We reject defendants' contentions of evidentiary error.  Accordingly, we affirm the judgment as modified by the striking of the misdemeanor false imprisonment convictions.

FACTS

In November 2004, Jefferson Ribeiro moved to Florida from Brazil.  He had a six-month tourist visa, but planned to stay illegally in the U.S. after his visa

---

[1] All statutory references are to the Penal Code unless otherwise stated.

expired.[2] Jefferson worked at a car wash for four months for very little money and then in construction for a few months. Meanwhile, his wife, Ana, and their young son lived in Brazil.

Sometime in 2005, Jefferson decided to try to bring Ana and their son to the U.S., but realized he could not do so legally. He became acquainted with a Dunkin' Donuts employee named Mauricio Freitas. In mid-2005, Jefferson agreed to pay Freitas $18,000 in exchange for Freitas arranging to have Ana and their son brought into the U.S. Jefferson paid Freitas a down payment of $4,000 and agreed to pay the balance in installments of $1,000 per month. Jefferson told Ana of his arrangement with Freitas. Ana agreed that she and their son would come illegally to the U.S. according to the plan.

On October 16, 2005, Ana and their son flew from Brazil to Mexico City. In Mexico City, a Mexican man picked them up at the airport and took them to a hotel where they stayed for three or four days.

Another Mexican man moved them to a house where about 40 Brazilians waited to be crossed into the U.S. Ana stayed there for seven to 10 days. She stayed inside the house and felt safe. Ana did not feel threatened, even though she was told that her son would not be fed until Jefferson sent more money. Based on warnings Ana received at the house, she believed that if the police saw her, they would separate her from her son. Although she was locked in the house, she stayed there willingly and relied on Joao (the person in charge of the house) to help her stay free from the police.

Meanwhile, in Florida, Freitas kept asking Jefferson for more money because there were "problems with the trip" and things were not going "according to the plan." Jefferson paid Freitas a total of around $13,000 in cash from his work earnings and money he borrowed from friends. Jefferson paid the money because, if he did not,

___

[2] For convenience and to avoid confusion, we refer to Jefferson Ribeiro and his wife by their first names and to their son variously as "their" son or "her" son. We mean no disrespect.

Ana and their son would remain "where they were." At some point Jefferson lost contact with Freitas, who could not be reached at his home or by phone.

Joao (the proprietor of the house in Mexico) phoned Jefferson and said that Freitas had not paid the agreed amount (not enough "to cross them over") and this was why Ana was still at Joao's house. Joao told Jefferson that he (Joao) was probably going to send Ana and her son back to Brazil. In a subsequent phone call, Jefferson told Joao to put Ana and her son on a flight to Brazil because Ana had roundtrip tickets. Joao said he would do so. But when Jefferson phoned Joao a few days later, Joao said Ana was already coming to the U.S.

Several days later, a man phoned Jefferson and told him in Spanish that Ana was already in the U.S. and that a person named "Junior" would phone Jefferson.

In the meantime, Ana and her son had been taken to another house in Mexico and then smuggled across the border hidden under a truck's seat. After arriving in the U.S., Ana and her son were brought to yet another house (transported in a truck driven by an American man) and then taken by another person to a gas station.

At the gas station, they were picked up by defendants in a van driven by Eid. Ana knew Eid as "Junior." Defendants took Ana and her son to a restaurant to eat, then to the Costa Mesa Travelodge, where the four of them initially stayed in one motel room. By then, Ana's journey had taken about 35 days.

Defendants treated Ana well at first. They let her use the motel Laundromat and talk with Jefferson on Eid's cell phone. They took her son to get a haircut. Once, Ana went with Oliveira to a computer store and then to get some food. Oliveira bought a computer and let Ana use it once. Defendants paid for food, laundry, and the motel room.

Defendants said they were waiting for more people to arrive from Mexico. After the second day at the motel, another woman (Monica Lino) arrived. The group then moved into two rooms with an adjoining door. Ana, her son, and Lino stayed in one

4

room, and defendants in the other. Defendants ordered Ana to never close the door between the two rooms.

One or two days later (which was a few days before Thanksgiving), Jefferson received a phone call from "Junior." Junior said he was with Ana and her son and that Jefferson should pay $14,000 for their release. Jefferson offered to pay $1,000 a month. Junior rejected the proposal, but offered to accept title to real property in Brazil instead. Jefferson's father owned property in Brazil, but was unwilling to help Jefferson. Junior, who had given Jefferson his cell phone number and also the motel's phone number, then agreed to accept half the money up front and the balance in installments. Jefferson did not agree because he did not have the money.

Sometime after Ana and her son moved into the room with Lino (on either Wednesday or Thursday), Jefferson and Ana spoke to each other by phone. Jefferson told Ana that defendants had asked for $14,000 in order to send Ana and their son to Florida. Ana felt afraid because she knew that she and Jefferson had no more money. Jefferson asked Ana if she could escape, but she said, "No way." Ana no longer wanted to stay with defendants, but instead wanted to go to Florida. She felt she could not contact the police "because it could be dangerous." She felt it would be hard for her to go "someplace" because she had no money, did not speak English, and did not know where she was.

On Thursday, defendants told Ana that if Jefferson failed to pay by Friday, they would take her to New York to work for them to pay off the debt. Eid grabbed her purse and removed the passports of Ana and her son. Eid said he needed the passports to buy their plane tickets to Florida. Eid returned the purse to Ana immediately.

Jefferson called Ana on the telephone in Ana's motel room. She told him that defendants had taken the passports.

On Thanksgiving Day, Jefferson phoned the motel's phone number and pressed the numbered option to learn the motel's address. At a Thanksgiving party in

5

Florida, Jefferson told his English-speaking neighbor, Ricardo, the motel's address. Ricardo said he had friends in California named Vanessa Silva and Rudson. Ricardo phoned Silva and learned that she and Rudson lived near the motel. Ricardo (or Jefferson) asked Silva and Rudson to go to the motel to see if Ana and her son were there.

Jefferson phoned Ana and told her that Silva and Rudson were coming to the motel and that Ana should leave with them if she could. Jefferson never told Ana to phone the police. Silva also called Ana's motel room phone and told Ana they would "pick her up at the hotel so she could be taken to the airport."

That night, Ana heard a knock on the door and got up to open it, but Oliveira did so first. A man and a woman stood outside. The woman said she was there to pick up Ana and Ana's son. Eid came from the other room and asked what they were doing there. Eid argued in a loud voice with the woman, saying "he was owed money and nobody was leaving until he got paid."

Oliveira told Ana to sit down and stay quiet. Ana's son started crying. The yelling outside went on for five minutes. Ana heard Eid ask Silva if she had the money and heard him say he would only release Ana when paid. Ana felt very afraid and wanted to go with Silva. Eid told Silva and Rudson to leave and stop bothering them or he would call the police. Silva replied she wasn't going anywhere and she was going to call the police.

Eid came in the room, shut the door, yelled at them to gather their stuff, and said they were leaving. He told Ana "they" should have never done that and they were in hot water. Ana gathered her belongings. Eid went down to the motel lobby to check out.

Meanwhile, Silva phoned 911 and reported that two men would not let Silva's friend and the friend's child leave a Travelodge room because the men were demanding payment.

6

In the motel room, Oliveira forcefully grabbed Ana's upper arm and Eid did the same with Lino. Defendants pushed them toward the van. Ana did not call out for help. She never saw any weapons during the time she was with defendants. (Ana later told the police that Oliveira tried to calm down her son in a "real sweet" way.) Defendants pushed them into the van and told them to lay down on the seat and to say they were on vacation if the police asked.

A police car dispatched to the scene blocked the motel's driveway. The police detained defendants. A Spanish-speaking police officer spoke briefly with Ana. Ana said in Brazilian Portuguese that she was being held against her will. Behind a seat in the van, the police found a knife that was inaccessible to the driver.

In April 2006, the federal government gave Ana and Jefferson immunity from prosecution for illegal entry into the U.S. in exchange for their testimony in interviews and in court. In 2008, Jefferson learned from an immigration attorney that victims of crime can obtain U-visas to stay in the U.S. Persons with U-visas can stay in the U.S. for "three years with the right to work and a social security number." Ana and Jefferson obtained U-visas in May 2010.

*Defense*

Three witnesses for Eid testified he was honest and hardworking and had his own transportation business in New York. Two witnesses for Oliveira testified he was an honest and hard-working handyman.

An officer who interpreted Brazilian Portuguese for Jefferson testified it was difficult to translate for Jefferson. The officer was not confident the translation was 100 percent accurate.

An immigration attorney testified that a U-visa allows victims of certain enumerated crimes that occur in the U.S. to remain temporarily in the U.S. After three years, a holder of a U-visa may then apply for permanent residency. On the application

7

form for a U-visa, a law enforcement agency must certify that the applicant has or will help in prosecuting a crime. On Ana and Jefferson's applications, they answered "no" to the question, "Did you aid, induce, abet, [or] assist another individual entering the country illegally?"

DISCUSSION

*The Jury Improperly Convicted Defendants of Two Lesser Included Offenses for Each Count in the Information*

The jury convicted defendants of two uncharged lesser included offenses (attempted extortion and misdemeanor false imprisonment) for each charge of kidnapping for ransom in the information. On appeal defendants contend the jury was permitted under section 954 to return only one conviction per count in the pleading. They conclude this court must modify the judgment by striking one conviction per count. The Attorney General counters that because attempted extortion and misdemeanor false imprisonment are not lesser included offenses of each other, the jury properly convicted defendants of both crimes for each count. An appellate court independently determines whether multiple convictions are proper under section 954. (*People v. Villegas* (2012) 205 Cal.App.4th 642, 646.)

Under sections 954 and 654, "[i]n general, a person may be *convicted* of, although not *punished* for, more than one crime arising out of the same act or course of conduct." (*People v. Reed* (2006) 38 Cal.4th 1224, 1226-1227 (*Reed*).) By its terms, section 954 permits the People to "charge two or more different offenses connected together in their commission . . . *under separate counts*," and specifies "the defendant may be convicted of any number of the offenses *charged*." (*Ibid*., italics added.)

In contrast to section 954's general rule permitting multiple convictions of *charged* crimes, a defendant may be convicted of an *uncharged* crime only if it is a lesser

8

included offense of a charged crime. (*Reed*, *supra*, 38 Cal.4th at p. 1227; see § 1159.) A "lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser." (*People v. Birks* (1998) 19 Cal.4th 108, 117.) The rule limiting convictions of *uncharged* crimes to lesser included offenses of charged crimes satisfies the due process requirement that an accused be given adequate notice of the charges so as to have a reasonable opportunity to prepare and present a defense. (*Reed*, at p. 1227.) The "'specific language of the accusatory pleading adequately warns the defendant that the People will seek to prove the elements of the lesser offense'" (*id.* at p. 1229), even though the lesser offense has not been separately charged.

Under another well-established rule, "a defendant may not be convicted of *both* a greater and lesser included offense." (*People v. Pearson* (1986) 42 Cal.3d 351, 355, italics added.) In *Reed*, our Supreme Court held that, for purposes of determining whether a *charged* crime is a lesser included offense of a *separately charged* greater offense, only the statutory elements test for a lesser included offense applies. (*Reed*, *supra*, 38 Cal.4th at p. 1229.) This is because the accusatory pleading test for a lesser included offense "ensure[s] that defendants receive notice before they can be convicted of an *uncharged* crime" and "has no relevance to deciding whether a defendant may be convicted of multiple *charged* offenses." (*Ibid.*, italics added.)

The issue before us does not fit precisely into any of the foregoing rules. Defendants stand convicted of *two* uncharged lesser included offenses of a greater charge, but neither lesser included offense is a lesser included offense of the other. At most, the lesser included offenses are lesser *related* offenses of each other. A lesser *related* offense is *not* "necessarily included in the stated charge, but merely bear[s] some conceptual and evidentiary 'relationship' thereto." (*People v. Birks*, *supra*, 19 Cal.4th at p. 112.)

We have not found, nor have the parties pointed us to, any published authority on this issue. Presumably the issue does not arise very often. It arises here because the charged greater crime — kidnapping for ransom — involves a primary victim (who is kidnapped) and "a secondary victim (who 'is subjected to a ransom or extortion demand')." (*People v. Eid*, *supra*, 187 Cal.App.4th at p. 868.) In effect, the offense of kidnapping for ransom, like other forms of aggravated kidnapping, combines two non-overlaying crimes. Thus, kidnapping for ransom subsumes lesser included offenses, like extortion and simple kidnapping, that are "related" to each other in a non-hierarchical way.

In *People v. Navarro*, our Supreme Court addressed a different issue of first impression concerning two lesser included offenses of an aggravated kidnapping charge. (*People v. Navarro* (2007) 40 Cal.4th 668, 674-675 (*Navarro*).) In doing so, *Navarro* interpreted two statutes: (1) section 1260, which empowers an appellate court to modify a judgment or reduce the degree of an offense; and (2) section 1181, subdivision (6), which permits a court (including appellate courts) to modify a judgment (in lieu of ordering a new trial) when a defendant has been convicted of a crime but the evidence supports guilt of only a lesser degree of the crime or a lesser included offense. (*Navarro*, at p. 671). *Navarro* reversed the Court of Appeal's modification of judgment pursuant to the foregoing statutes, which modification had replaced the defendant's *single* conviction for attempted kidnapping during carjacking with *two* lesser included offense convictions for attempted carjacking and attempted simple kidnapping. (*Id.* at p. 674.) Our Supreme Court explained that sections 1181 and 1260 "do *not* authorize an appellate court to modify a judgment to reflect convictions for *two* lesser included offenses upon finding insufficient evidence of a *single* greater offense, and the Court of Appeal's two-for-one modification of the judgment . . . was improper." (*Navarro*, at pp. 680-681, italics added.)

10

*Navarro* observed that, historically, courts have uniformly interpreted and applied sections 1181 and 1260 to permit replacement of "a *single* greater offense with a *single* lesser offense," or, in other words, "a one-for-one modification." (*Navarro*, *supra*, 40 Cal.4th at p. 679, italics added.) In this respect, our Supreme Court noted that "both statutes repeatedly refer to 'the crime' or 'the offense' in the singular." (*Id.* at p. 680.) Although the Court of Appeal had relied on the Penal Code's general provision (§ 7) that "'the singular number includes the plural, and the plural the singular,'" our Supreme Court considered section 7 "to be a slim reed upon which to support the Court of Appeal's *unprecedented action*." (*Navarro*, at p. 680, italics added.) *Navarro* noted that, when section 1181, subdivision 6 was enacted to permit one-for-one modification (*Navarro*, at p. 676), the statute was considered to be "'a complete departure in our criminal jurisprudence'" and "a 'startling innovation'" (*id.* at p. 680). *Navarro* continued: "There is little doubt that modifying one greater offense to reflect convictions for *two* lesser offenses would have been an even greater 'departure in our criminal jurisprudence' and an even more 'startling innovation.' [Citation.] As we have stated, 'it should not "be presumed that the Legislature in the enactment of statutes intends to overthrow long-established principles of law unless such intention is made clearly to appear either by express declaration or by necessary implication."'" (*Ibid.*)

Returning to the case at hand, we focus on the two statutes that might permit the multiple convictions here. Applying *Navarro's* reasoning, we note that section 1159, which authorizes conviction of a lesser included crime, permits a fact finder to find a defendant guilty of "any offense . . . necessarily included" in a charged crime, using the word "offense" in the singular. (*Ibid.*)

Section 954 specifies that a "defendant may be convicted of any number of the offenses *charged*." (*Ibid.*, italics added.) Taken literally, this language permits one conviction per charge. The purpose of section 954 is to govern "the form of the information" (*People v. Brooks* (1985) 166 Cal.App.3d 24, 29) and to permit joinder of

11

different offenses so as to prevent "repetition of evidence and save[] time and expense to the state as well as to the defendant" (*People v. Scott* (1944) 24 Cal.2d 774, 779). "'[A]n information plays a limited but important role: It tells a defendant what *kinds* of offenses he is charged with (usually by reference to a statute violated), and it states the *number* of offenses (convictions) that can result from the prosecution.'" (*People v. Butte* (2004) 117 Cal.App.4th 956, 959, quoting from Justice Sims's concurring opinion in *People v. Gordon* (1985) 165 Cal.App.3d 839, 870, parts of which were quoted with approval by our Supreme Court in *People v. Jones* (1990) 51 Cal.3d 294, 317.) Section 954 is not a blanket authorization allowing the number of convictions to exceed the number of charges.

We have not found, nor have the parties directed us to, any legal authority stating that a jury may convict a defendant of *two* uncharged lesser included offenses of *one* charged crime. Like the *Navarro* court, we decline to interpret sections 954 and 1159 so broadly as to establish an arguably unexpected innovation in criminal jurisprudence.

Under *Navarro*, *supra*, 40 Cal.4th 668, if the court, in ruling on a new trial motion, concludes the evidence is insufficient to sustain the jury's conviction on the greater charged offense, it may *not* impose a conviction on more than one lesser included offense. It would be anomalous to allow a jury to do what the judge may not, i.e., to conclude that the evidence does not sustain a conviction on the greater offense, but then to convict on more than one lesser included offense.

We conclude the jury's conviction, of defendants, for two uncharged lesser included offenses of a single charged crime was *not* statutorily authorized. Under any standard, the error was prejudicial because each defendant suffered four convictions based on an information containing only two counts. (See *People v. Powell* (2013) 214 Cal.App.4th 106, 109 ["error was prejudicial because it allowed the jury to convict Powell of an offense of which he had no reasonable notice"].)

12

But we must still determine the proper remedy for this prejudicial error. In *Navarro*, our Supreme Court instructed the Court of Appeal to strike the attempted kidnapping conviction, explaining: "[W]here there are multiple lesser included offenses supported by the evidence at trial, a court exercising its discretion to modify the judgment pursuant to these provisions should choose the offense with the longest prescribed prison term so as to effectuate the fact finder's apparent intent to convict the defendant of the most serious offense possible." (*Navarro*, *supra*, 40 Cal.4th at p. 681.) This remedy makes equal sense here. (See also *People v. Medina* (2007) 41 Cal.4th 685, 701-702 [rejecting People's request that "the rule against multiple convictions based on necessarily included offenses" be modified "to permit courts to stay, instead of strike, convictions for lesser included offenses"].) Since attempted extortion carries a longer prison term than misdemeanor false imprisonment, we will strike defendants' misdemeanor false imprisonment convictions.[3] Because the trial court sentenced defendants to the high term for attempted extortion, we will not remand the case to the trial court for resentencing.

Because we have determined defendants' convictions for misdemeanor false imprisonment must be stricken, we do not address defendants' contention the court violated section 654 by failing to stay execution of sentence on the false imprisonment convictions.

---

[3] Defendants argue the attempted extortion conviction should be stricken because the information did not name Jefferson as the victim. Their contention is meritless since an accusatory pleading is not required to specify such details. (§ 952.) The amended information sufficiently identified the kidnapping victims as Ana and her son and the extortion victim as "another person."

*The Court Did Not Err by Admitting into Evidence the Officer's Testimony About Ana's Statements*

Defendants contend the court improperly allowed a Spanish-speaking officer to testify about statements Ana made in Brazilian Portuguese. The People offered the evidence of Ana's prior consistent statement to rebut the defense argument that Ana, due to her U-visa, might have lied at trial about being held by defendants against her will. The court ruled the evidence was admissible and its admission did not violate defendants' due process rights, despite the alleged language barrier, because (1) the evidence was consistent with Ana's testimony at trial, (2) any language problems went to the weight of the evidence, (3) there had been testimony (such as Jefferson's) that although differences exist between Spanish and Brazilian Portuguese, it was possible to communicate using both languages, and (4) both Ana and the officer were subject to cross-examination.

The officer testified as follows. He spoke to Ana briefly in the Travelodge parking lot and she told him that she, her son, and Lino were "being held against their will" because defendants wanted more money. The officer spoke in Spanish, while Ana replied in Portuguese. The officer had no training in or experience with the Portuguese language, having never spoken to a Portuguese speaker before. But despite the language difference, he and Ana "were able to communicate just fine with each other." He was generally able to understand her, although at times he could not understand exactly what she was saying. In these latter instances, he would ask her to clarify what a word meant. The officer did not record the interview. He spoke just briefly to Ana "to ascertain what was occurring and if there was a crime . . . happening."

Ana testified she found it difficult to communicate with the officer and understood about 70 percent of the conversation.

A witness's prior statement consistent with his or her trial testimony is admissible if "'an express or implied charge is made that the testimony is recently fabricated or influenced by bias or other improper motive, and the consistent statement

14

was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen.'" (*People v. Ervine* (2009) 47 Cal.4th 745, 780; Evid. Code, §§ 791, 1236.) Defendants, by challenging the reliability of the evidence, effectively contend its foundation was inadequate to permit the jury to find the officer correctly understood Ana's statements. (Evid. Code, § 403, subd. (a)(4).) A "court should exclude the proffered evidence only if the 'showing of preliminary facts is too weak to support a favorable determination by the jury.'" (*People v. Lucas* (1995) 12 Cal.4th 415, 466.) Under Evidence Code section 403, subdivision (a)(4), the trial court must make a preliminary determination whether the foundational evidence is sufficiently substantial, but the jury has the final "authority to determine the question of the existence of the preliminary fact." (*Lucas*, at p. 466.) The decision whether the foundational evidence is sufficiently substantial is a matter within the court's discretion. (*Id.* at p. 467.)

Defendants rely on *Correa v. Superior Court* (2002) 27 Cal.4th 444, but that case is factually inapposite, as it involved officers' testimony on extrajudicial statements made by Spanish-speaking persons, which statements were translated for the non-Spanish-speaking officers by apparently unbiased bystanders. (*Id.* at p. 448.) The issue was whether the translations made by the bystanders constituted a separate level of hearsay. (*Id.* at p. 453.)

Here, there was no intermediate translator. To the extent the officer acted as a translator, the "language-conduit theory calls for a case-by-case determination whether, under the particular circumstances of the case, the translated statement fairly may be considered to be that of the original speaker." (*Correa v. Superior Court*, *supra*, 27 Cal.4th at p. 457.) "The court should consider 'a number of factors which may be relevant in determining whether the interpreter's statements should be attributed to the [declarant] . . . , such as which party supplied the interpreter, whether the interpreter had any motive to mislead or distort, the interpreter's qualifications and language skill, and whether actions taken subsequent to the conversation were consistent with the statements

15

as translated.'" (*Id.* at p. 458.) "'[W]here the particular facts of a case cast significant doubt upon the accuracy of a translated [statement], the translator . . . must be available for testimony and cross-examination at the . . . hearing before the [statement] can be admitted.'" (*Id.* at p. 459.) Here, the police officer (acting effectively as an interpreter) tried to find out what was happening and had no motive at that time to mislead or distort Ana's statements. And although the officer's language skills in Brazilian Portuguese were certainly less than optimal, his understanding of Ana's statements was consistent with her trial testimony. The court's finding that a sufficient foundation had been laid to allow the jury to consider the testimony was not an abuse of discretion.

In any case, defendants were not prejudiced by the admission of Ana's prior consistent statement because overwhelming evidence showed that, after the arrival of Silva, defendants held Ana and her son against their will.

*The Court Properly Admitted into Evidence Silva's 911 Phone Call*

In a 911 phone call, Silva reported that two men would not let her "friend" and the friend's child leave a Travelodge room because the men were demanding payment. Defendants contend Silva's statements in the phone call constituted hearsay and were inadmissible under the spontaneous declaration exception because Silva's falsehoods (about Ana being her friend and about Jefferson telling her Ana was being held against her will) showed Silva spoke with deliberation and reflection.

Evidence Code section 1240 provides: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception." "'To render [statements] admissible [under the spontaneous declaration exception] it is required that (1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and

16

unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it.'" (*People v. Poggi* (1988) 45 Cal.3d 306, 318 (*Poggi*).) A "statement may qualify as spontaneous if it is undertaken without deliberation or reflection." (*People v. Morrison* (2004) 34 Cal.4th 698, 718.)

"Whether the requirements of the spontaneous statement exception are satisfied in any given case is, in general, largely a question of fact. [Citation.] The determination of the question is vested in the court, not the jury.'" (*People v. Poggi*, *supra*, 45 Cal.3d at p. 318.) "The trial court must consider each fact pattern on its own merits and is vested with reasonable discretion in the matter." (*People v. Morrison*, *supra*, 34 Cal.4th at p. 719.) "The crucial element in determining whether an out-of-court statement is admissible as a spontaneous declaration is the mental state of the speaker." (*People v. Gutierrez* (2009) 45 Cal.4th 789, 811.) Because this element strongly "relates to the peculiar facts of the individual case . . . [citations], the discretion of the trial court is at its broadest when it determines whether this requirement is met [citation]. Indeed, Dean Wigmore goes so far as to urge that the issue should be left 'absolutely to the determination of the trial court.'" (*Poggi*, at pp. 318-319; see 6 Wigmore, Evidence (Chadbourn rev. ed. 1976) § 1750, pp. 202-222.)

Here, the court did not abuse its discretion by admitting the 911 call into evidence. Silva testified she phoned 911 immediately after the door to the motel room closed and that she felt "startled, confused, [and] a little scared." While Silva was on the phone with the 911 operator, she watched the quickly unfolding events — Eid checking out of the motel and defendants rushing Ana, Ana's son, and Lino to the van. As to the "friend" falsehood, Silva testified that in Brazil, once a person meets somebody, the person is a friend, and also that she referred to Ana as a "friend" in order to elicit a quick response. When Silva was asked by defense counsel why she inaccurately told the 911

17

operator that Jefferson told her Ana was being held against her will, Silva replied "it was [an] in the moment situation" and she "probably blurt[ed] it out" and "it came out that way" because "Ana was being held at the time." These untruths do not evidence such a level of deliberation as to render Silva's statements nonspontaneous.

In any case, defendants were not prejudiced by the challenged evidentiary ruling because overwhelming evidence showed that, after Silva's arrival, defendants held Ana and her son against their will.

## DISPOSITION

We reverse the convictions on the misdemeanor false imprisonment counts and modify the judgment by striking defendants' convictions for misdemeanor false imprisonment, resulting in a total sentence of two years and six months for each defendant. In all other respects, the judgment is affirmed.

IKOLA, J.

WE CONCUR:

O'LEARY, P. J.

ARONSON, J.

18