Filed 2/6/14  P. v. Ruelas CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RAMON DE JESUS RUELAS,<br><br>    Defendant and Appellant. | B240666<br><br>(Los Angeles County<br>Super. Ct. No. KA091532) |
| In re RAMON DE JESUS RUELAS,<br><br>    on Habeas Corpus. | B251018<br><br>(Los Angeles County<br>Super. Ct. No. KA091532) |

APPEAL from a judgment of the Superior Court of Los Angeles.  George Genesta, Judge.  Affirmed.

ORIGINAL PROCEEDING; petition for writ of habeas corpus.  George Genesta, Judge.  Petition denied.

Carlo Andreani, under appointment by the Court of Appeal, for Defendant, Appellant and Petitioner.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr., and Stephanie Miyoshi, Deputy Attorneys General, for Plaintiff and Respondent.

Ramon de Jesus Ruelas appeals from a judgment entered after a jury found him guilty of kidnapping to commit robbery, corporal injury to a former cohabitant, and criminal threats. The jury also found Ruelas used a deadly and dangerous weapon, a screwdriver, when he made the criminal threats. The trial court sentenced him to a prison term of life plus four years. On appeal, Ruelas contends the trial court erred (1) in striking the testimony of one of his witnesses, (2) in instructing the jury on kidnapping to commit robbery, and (3) in not instructing sua sponte on attempted kidnapping to commit robbery. We affirm.

In the petition for writ of habeas corpus, which we consider with the appeal, Ruelas contends, among other things, that the jury committed misconduct in discussing and drawing adverse inferences of guilt from Ruelas's exercise of his constitutional right not to testify, and that his trial counsel rendered ineffective assistance in not filing a motion for new trial based on this claim of jury misconduct. Ruelas has not submitted any juror declarations or affidavits with his petition for writ of habeas corpus. He has not established a prima facie case for relief on any of his claims. Accordingly, we deny his petition.

## BACKGROUND

### Charges

An information charged Ruelas with two counts of forcible oral copulation (Pen. Code, § 288a, subd. (c)(2);[1] counts 1 & 2), kidnapping to commit robbery (§ 209, subd. (b)(1); count 3), corporal injury to a cohabitant (§ 273.5, subd. (a); count 4), and criminal threats (§ 422; count 5). The information also alleged Ruelas used deadly and dangerous weapons, within the meaning of section 12022, subdivision (b)(1), in the commission of the forcible oral copulation charged in count 2 (a fork and a cigarette lighter), and when he made the criminal threats (a screwdriver). The information further alleged Ruelas had sustained a prior conviction and had served a prior prison term within the meaning of section 667.5.

---

[1] Statutory references are to the Penal Code unless otherwise indicated.

The information also charged Ruelas's codefendant, Arthur Villa, with kidnapping to commit robbery in count 3.

**Prosecution Evidence**

According to the trial testimony of the victim, Vanessa J., at about 5:00 a.m., on August 5, 2010, she woke up when she heard loud knocking on the door to her apartment in Pomona. She went to the door and saw that it was Ruelas knocking. She was not expecting him. She did not want to open the door, but she did because she did not want Ruelas to wake her four sleeping children (ages 5, 9 (twins) and 10) with his loud knocking. Vanessa and Ruelas had dated for eight months and had lived together in her apartment for seven of those months. They had ended their dating relationship a couple of days to a week before August 5, 2010.[2] Ruelas was no longer living at Vanessa's apartment. He is not the father of any of her children.

On the morning of August 5, 2010, Ruelas told Vanessa he wanted to talk to her about their relationship. She did not want to talk to him, but gave in "[b]ecause he didn't seem like he wanted to leave." She allowed him to come into her living room. When she told him she would not resume their dating relationship, he became upset. They started to argue. Ruelas asked her "to have sex with him." She declined. He then demanded she perform "oral sex on him." Again she refused.

Vanessa testified at trial that Ruelas grabbed her by her hair, led her into the bathroom and closed the bathroom door. She was crying. He demanded she undress, get on her knees and perform oral sex on him. She was surprised by his behavior. She undressed and he shoved her down to her knees. He was holding her by her hair. She began performing oral sex on him. When she stopped or did not comply with his instructions, he would hit her on both sides of her head. Vanessa was concerned her

_____

[2] In response to the prosecutor's question about why she and Ruelas had ended their dating relationship, Vanessa testified: "He wasn't being the boyfriend I wanted him to be. He wouldn't cooperate with my kids. He would leave for days and not tell me where he was at." Later, when Ruelas's counsel asked her if Ruelas was "good" with her kids, Vanessa stated, "Yes, he was okay with my kids."

children were going to wake up because her cries were echoing and her children were asleep in the two rooms adjacent to the bathroom. She told Ruelas they should leave the bathroom so her children would not wake up.

According to Vanessa, Ruelas opened the bathroom door and led her by her hair to the living room. He sat on the couch and demanded she continue to perform oral sex on him. Holding onto her hair, Ruelas pushed her down to her knees. She resumed performing oral sex on him. When she did not comply with his instructions, he hit her on her cheeks with his fists and threatened to stab her with a fork he was holding. Ruelas also held a lighter next to her face. Then he burned her neck with the lighter. Vanessa continued to cry and beg Ruelas to stop. Eventually, Ruelas ejaculated in her mouth and pushed her away. She fell back and vomited.[3]

Ruelas told Vanessa he needed money and asked if she had any. She told him she "only had [her] EBT money," or "government cash aid," but that money was for her rent. Ruelas responded: "'I need money. You're going to give me my money.'" Vanessa testified she did not owe Ruelas any money.[4] Ruelas told Vanessa to get dressed and she complied. Ruelas grabbed her by her hair and walked her to a bedroom where some of her children were sleeping so she could get her wallet. Vanessa told Ruelas she did not want to leave her children alone in the apartment, but he forced her to leave, pulling her by her hair. He did not allow her to close the apartment door as they left. She was crying and asking him to stop.

---

[3] As discussed below, the jury deadlocked and could not reach a verdict on counts 1 and 2 alleging forcible oral copulation. The jury did find Ruelas guilty, however, of corporal injury to a former cohabitant based on the injuries Vanessa sustained during the time she claimed Ruelas was forcing her to orally copulate him. We do not summarize the scientific evidence presented by the prosecution and defense regarding oral swab samples collected from Vanessa because it is not germane to the issues on appeal.

[4] At trial, Vanessa testified Ruelas did not know the code for her EBT account. At the preliminary hearing, however, she testified Ruelas did know the code and she had allowed him to use her EBT card in the past.

Ruelas continued to pull Vanessa by her hair as they walked to another building in her apartment complex. As they entered the building and walked up the stairs to the second floor, Vanessa realized they were heading toward an apartment where a woman named Monique and a man named Huero lived. Vanessa knew them because she passed by the front of their apartment when she took her children to school. Ruelas knocked on the window of the apartment and Monique and Huero came to the door. Vanessa was crying, but she was too scared to ask for help. Neither Monique nor Huero asked Vanessa if something was wrong. Ruelas asked Monique and Huero if Arthur Villa (Ruelas's codefendant) was there and they responded affirmatively. Vanessa knew Villa.

Villa came to the door. Ruelas was still holding Vanessa by her hair and Vanessa was still crying. Villa exited the apartment and asked Ruelas what he needed. Ruelas said he needed a ride. Ruelas also told Villa, "'We just came up.'" Vanessa understood this statement to mean they were going to steal her money. Vanessa told Villa she did not want to go with Ruelas. She asked Villa not to give Ruelas a ride. Villa ignored her. He agreed to give Ruelas a ride and told Ruelas to meet him "'in the back.'" Ruelas and Vanessa followed Villa down the stairs. Villa walked to a dark blue van which was parked on the street in front of the apartment building. Ruelas led Vanessa by her hair to the alley behind the building.

Villa drove the van into the alley where Ruelas and Vanessa were waiting. Villa exited the van and opened the sliding door. Ruelas and Vanessa climbed into the back of the van and Villa returned to the driver seat. Vanessa continued to cry and to tell Ruelas she did not want to go with him. Ruelas continued to hold her by her hair. He also held a screwdriver to her ribs and demanded she obey him.

Villa asked Ruelas where they were going. Ruelas told Villa to drive to a bank or a Walmart where Vanessa could withdraw cash. Vanessa suggested they go to a Bank of America because she knew there was a police station nearby and she wanted to escape. Ruelas responded to Vanessa's suggestion by saying, "'Shut the fuck up, bitch,'" and telling her she had "no say" in where they were going. Ruelas and Villa decided to go to Walmart. According to Vanessa, Villa asked Ruelas "how much was his cut going to

5

be," and Ruelas responded, "Three bills." Vanessa interpreted Ruelas's response to mean $300.

Villa drove to a Walmart in Pomona and parked the van. Before Ruelas and Vanessa exited the van, Ruelas told her she had "better obey and stay next to him the whole time or else he would handle [her]." Ruelas held a screwdriver up to Vanessa as he told her to obey and refrain from making a scene inside the store. Villa also told Vanessa if she did not obey Ruelas he (Villa) would "handle" her. Vanessa was afraid for her safety because she believed they were threatening to hurt her.

Ruelas and Vanessa exited the van. Villa waited inside the van. Ruelas grabbed Vanessa's hand and squeezed it hard as they walked toward the entrance to Walmart. Once inside, Vanessa looked around Walmart for an ATM machine or a cashier station where she could withdraw cash. She believed Ruelas expected her to withdraw all of the money from her EBT account. Vanessa spotted an ATM machine, but did not walk toward it because there was no one near the machine who could help her escape. Vanessa did not believe Ruelas had spotted the ATM machine.[5]

Ruelas and Vanessa approached cashier Cheryl Kosmatka. According to Kosmatka, who testified at trial, Vanessa "looked very timid" and her "makeup was smeared." Vanessa was frowning and she kept repeating "no" as she tried to pull away from Ruelas. Ruelas and Vanessa told Kosmatka they wanted to withdraw money from an EBT account. Kosmatka recalled Ruelas did most of the talking. Kosmatka explained they had to purchase something before they could withdraw cash. Vanessa testified at trial she told Ruelas to "'get a soda.'" He told her to get it, but she refused and insisted he get it. Ruelas let go of her hand and went to get a soda. Then he returned to the cash register.

_____

[5] The facts set forth above regarding the August 5, 2010 incident are taken from Vanessa's testimony. Testimony from other trial witnesses is identified and summarized below.

6

According to Kosmatka, Vanessa told Ruelas, "'I'm not going to do what you want me to do anymore,'" or "'I'm not going to do this for you. I don't want to do this, not anymore.'"[6] Vanessa told Kosmatka Ruelas had beaten her and she asked Kosmatka to dial 911. Vanessa recalled she told Kosmatka, Ruelas had taken her to Walmart "forcefully." Kosmatka recalled Vanessa saying, "'he's trying to make me take my money out to give him.'" Kosmatka told Vanessa to follow her to another location in the store where she could place the call. According to Vanessa, Ruelas looked "shocked," but he did not say or do anything.

Kosmatka left her cash register and walked toward the customer service area where she could place an outgoing call. Ruelas and Vanessa walked away from Kosmatka. Vanessa followed Ruelas to the exit. Ruelas walked outside. Vanessa turned around and walked toward a McDonald's restaurant located inside the Walmart store where employees were eating breakfast. Kosmatka turned around and "panicked" when she saw that Vanessa was not following her. Then Kosmatka saw Vanessa running toward McDonald's where several employees were congregated and holding cellular telephones. Vanessa testified that she was "crying and hysterical" when she reached the group of employees, and they dialed 911 for her.

The prosecutor played an audio recording of the 911 telephone call for the jury and the trial court admitted into evidence the recording and a transcript of the recording. The Walmart employee who dialed 911 told the operator Vanessa was "scared." When Vanessa took the phone, she told the operator: "My -- my kids are home alone. He made me come over here to Wal-Mart. . . . He was beating me up. He wanted me to give him my cash . . . my money, he made me come over here. . . ." Later in the call Vanessa stated Ruelas "forced" her to leave her home and her children. She told the operator Ruelas "was slapping [her] in the face." She also told the operator Ruelas took her out of the house by her hair, hurt her stomach with a screwdriver and was "socking" her in the

---

[6] Vanessa testified at trial that she did not remember saying "'not anymore'" when she told Kosmatka she did not want to do what Ruelas wanted her to do.

7

face. When the operator asked Vanessa how she was able to get away from Ruelas, Vanessa replied, "I told him I wasn't gonna give him his -- the money cause that was my kids money for the rent and he just looked at me and he just walked out."

During the 911 call, Vanessa stated Ruelas had her "house key" and Villa had a gun in the van. Vanessa indicated she heard Ruelas ask Villa if he had a gun and Villa stated he had one "in the back."[7] The operator asked Vanessa for her telephone number in case the operator needed to call Vanessa back. Vanessa explained she had a cell phone but Ruelas had taken the battery from her phone. Vanessa expressed concern that Ruelas and Villa might return to her apartment where her four children were home alone. During the call, Vanessa referred to Ruelas as her "boyfriend."

Police officers responded to Walmart and spoke with Vanessa. Pomona police officer Joseph Castillo, who testified at trial, responded to Vanessa's apartment complex after hearing a radio call with a description of the blue van. Officer Castillo saw a blue van in the alley behind the apartment complex. Villa was inside the van. Officer Castillo ordered Villa out of the vehicle and detained him. Officer Castillo did not find a gun when he searched the van. Officers found a "seven-inch craftsman screwdriver" with a blue and red handle about a foot away from the left rear tire of the van. They booked the screwdriver into evidence because Vanessa told them Ruelas held the screwdriver against her rib cage during the incident.

A police officer drove Vanessa home. Her children were still asleep. Pomona police officer Anthony Luna, who testified at trial, met Vanessa at her apartment complex and interviewed her in the backseat of his car. According to Officer Luna, Vanessa had "bruising to her face. Her makeup was smeared. She'd obviously been crying. She was

---

[7] At trial, Vanessa testified consistently regarding hearing Villa say he had a gun in the back of the vehicle. She testified inconsistently, however, regarding Ruelas having her house key. At trial, Vanessa testified she did not recall telling the 911 operator Ruelas had her house key, and she did not know why she would have said that because she had never given him her house key. At the preliminary hearing, however, Vanessa testified Ruelas had a key to her home at some point but she had taken it back from him before the August 5, 2010 incident.

8

shaken up, hands were tremoring [*sic*]. [She was] [o]bviously very upset." Officer Luna also observed "a burn mark on the left side of her neck." Vanessa "complained that each side of her head was hurting from [Ruelas] punching her on each side of the head." Vanessa declined medical attention. Officer Luna took photographs of Vanessa's injuries on August 5, 2010, and the prosecutor showed the photos to the jury.

While Officer Luna was interviewing Vanessa, Ruelas "approached the area" and Vanessa pointed him out. Ruelas was detained. During a search, an officer found a "Bic lighter" in Ruelas's pocket. Officer Luna booked the lighter into evidence because Vanessa told him Ruelas "had used the Bic lighter and burned the side of her."

Vanessa showed Officer Luna the areas inside her apartment where the incident had occurred, and he photographed those areas. In the living room, Officer Luna found "a stainless steel-looking fork" in between the armrest and seat cushion of the sofa. Vanessa told him Ruelas had been "holding the fork in his hand and threatened to shank her if she didn't cooperate." Vanessa told Officer Luna that Ruelas forced her to orally copulate him, but she did not tell him that she vomited after Ruelas ejaculated in her mouth. Officer Luna did not see any vomit in the living room.

**Defense Evidence**

Neither Ruelas nor Villa testified at trial.

Maria Esparza Frias testified on behalf of Ruelas. In August 2010, she lived in an apartment directly above Vanessa's apartment. Between 9:00 and 10:00 p.m. on August 4, 2010, the night before the incident, Esparza's husband saw Ruelas trying to fix the door to Vanessa's apartment. Esparza's husband brought Ruelas an electric screwdriver and helped Ruelas fix the door before returning upstairs to the apartment he shared with Esparza.

Esparza testified she did not hear any noises coming from Vanessa's apartment between 1:00 and 6:00 a.m. on August 5, 2010, the morning of the incident. She woke between 5:30 and 6:00 a.m. that morning to help her husband get ready for work. Esparza stated she would have heard if someone had knocked loudly on the door to Vanessa's apartment. She did hear, however, a woman named Monique and a man

9

telling another man to get out of Vanessa's apartment because the police were coming. Esparza observed that the man who was being told to leave Vanessa's apartment was detained by police when he was trying to get into a van in the parking lot.

Esparza stated the reason she remembered the events of August 4-5, 2010 is because she was planning to move out of her apartment a couple of days later. She testified that she wanted to move because men were coming in and out of Vanessa's apartment and she could "smell drugs." Esparza described the smell as one of "medication." She stated she saw men leaving Vanessa's apartment "almost everyday," "holding something like a bowl" that "was burned." She also saw the men and Vanessa break the bowl on the ground. Esparza's son told her the bowl was used "to smoke rock." Esparza testified that she saw Vanessa "hide her drugs" in a storage space in the parking lot outside her apartment.[8] She also testified that she saw Vanessa leave her children home alone during the day and during the night.

Ricardo Avina also testified on behalf of Ruelas. In August 2010, he lived in the apartment directly upstairs from Vanessa (with Esparza). He testified that, on August 4, 2010, he arrived home between 9:00 and 10:00 p.m. He saw Ruelas fixing the door to the apartment where he (Ruelas) lived with Vanessa. Avina offered to help Ruelas fix the door. Avina helped for about 15 minutes, but they could not fix the door. Avina went home to his apartment upstairs. He stated that he did not hear any "strange noises" coming from Vanessa's apartment between 1:00 and 7:00 a.m. on August 5, 2010. On other occasions, however, he had heard people close the door to Vanessa's apartment and knock loudly. Between 5:30 and 6:00 a.m. on August 5, 2010, he heard the police "banging" on Vanessa's door.

Villa did not present any witnesses.

---

[8] In response to questioning at trial by Ruelas's counsel, Vanessa denied using drugs the morning of August 5, 2010.

10

**Verdicts and Sentencing**

The jury found Ruelas guilty of kidnapping to commit robbery, corporal injury to a former cohabitant, and criminal threats. The jury also found Ruelas used a deadly and dangerous weapon when he made the criminal threats (a screwdriver). The jury was deadlocked on counts 1 and 2 for forcible oral copulation against Ruelas, and count 3 for kidnapping to commit robbery as to Villa only, and the trial court declared a mistrial as to those counts. The court subsequently granted the prosecution's motion to dismiss counts 1 and 2 against Ruelas.

The trial court sentenced Ruelas to a life term on count 3 for kidnapping to commit robbery and a consecutive four-year term on count 4 for corporal injury to a former cohabitant, for a total prison term of life plus four years. The court imposed and stayed the sentence on count 5 for criminal threats.

## DISCUSSION

**I.     Appeal (B240666)**

**A.  Exclusion of Margarita Ruelas's testimony**

Ruelas contends the trial court violated his constitutional rights when it struck the testimony of his mother, Margarita Ruelas.

**Proceedings below**

When Vanessa testified during the prosecution case, she testified about her relationship with Margarita Ruelas. Vanessa stated she had met Margarita on several occasions, and knew Margarita did not want Ruelas to date her because she (Vanessa) had four children and Ruelas was too young to be a good parent to them.[9] Margarita suggested to Vanessa that she break off the relationship with Ruelas. Vanessa testified that she liked Margarita, even though Margarita did not approve of her relationship with Ruelas, because Margarita was not rude when she expressed her opinions.

The defense called Margarita Ruelas as a witness. Margarita testified that she had met Vanessa and had spoken with her on more than 10 occasions prior to August 5, 2010.

_____

[9] Ruelas was 20 years old during the events described in this case.

11

Margarita and Vanessa had discussed Vanessa's relationship with Ruelas. Margarita stated: "I was not in agreement with her being with my son because he's a young man, and it's too much of a responsibility to be with a woman that has four children."

At that point, the prosecutor objected on the ground of "improper impeachment," stating, "The victim has already admitted to this conversation and acknowledged it." The trial court overruled the objection because the testimony "may indicate a bias."

Ruelas's counsel asked Margarita how Vanessa responded when Margarita told her she disapproved of the relationship. Margarita testified: "The first time, she shut the door on my face." Margarita went home after Vanessa shut the door in her face. Ruelas's counsel then asked Margarita, "The second time that you had this conversation with her, what did she tell you --" The trial court interrupted Ruelas's counsel, stating, "Counsel move on to another subject."

Ruelas's counsel asked Margarita, "Did Vanessa ever threaten you with revenge because you didn't like her for your son?" The prosecutor raised a hearsay objection which the trial court sustained. Ruelas's counsel withdrew the question. Ruelas rested.

After a break in the proceedings, the trial court stated: "There's a couple things we need to cover, but, first of all, address the last witness. [¶] All we have is a question and answer regarding the animus between this witness and the -- and Vanessa, and so there was nothing further introduced. So it appears that under 352, the People's objection was well taken and her testimony, as short as it was, probably should be stricken." In response, Ruelas's counsel stated, "Submit, Your Honor." The prosecutor stated, "I would move for that, Your Honor."[10] The court stated: "I thought it was a -- a prelude to further inquiry, so the court will strike her testimony and so inform the jury."

The trial court later informed the jury: "I did omit something, ladies and gentlemen. The last witness who only had a couple of questions, I have stricken her

[10] In his reply brief on appeal, Ruelas argues the prosecutor did not object to Margarita Ruelas's testimony under Evidence Code section 352 "[i]nitially," so it was improper for the trial court to "impose and sustain . . . its own Evidence Code section 352 objection." Ruelas cites no authority in support of this argument and we reject it.

12

testimony for all purposes. You shall not consider her testimony for any purpose whatsoever."

### Analysis

"'A trial court has broad discretion under Evidence Code section 352 to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." This discretion allows the trial court broad power to control the presentation of proposed impeachment evidence ""to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues." [Citation.]"" [Citations.] On appeal, we evaluate rulings under Evidence Code section 352 using the abuse of discretion standard. [Citation.]" (*People v. Riccardi* (2012) 54 Cal.4th 758, 808-809.)

The trial court did not abuse its discretion in striking Margarita Ruelas's testimony. The testimony does not indicate what Ruelas claims it indicates. Ruelas asserts, "Vanessa's shutting the door in Mrs. Ruelas' face was relevant to Vanessa's credibility to disprove her truthfulness, circumstantially contradicted Vanessa's extravagant testimony that she had 'nothing' against Mrs. Ruelas, and evidenced Vanessa's painful anger, hostility, and resentment." Ruelas also asserts that the "erroneously stricken testimony evidenced Vanessa's hostile bias against [Ruelas's] mother and her motive to fabricate against [Ruelas]." We disagree with these assertions. Vanessa testified that she liked Margarita Ruelas, even though Margarita expressed her disapproval of the relationship between Vanessa and Ruelas, because Margarita was not rude in expressing her opinions. The fact Vanessa shut the door in Margarita's face the *first* time Margarita told Vanessa she did not approve of the relationship does not contradict Vanessa's testimony. Ruelas's counsel did not ask Margarita about the state of her relationship with Vanessa at or around the time of the events of August 5, 2010. Margarita's testimony did not tend to show that Vanessa had a "hostile bias" toward Margarita on or about August 5, 2010 or up to the time of trial. Thus the testimony had the potential of confusing the issues or misleading the jury.

13

There is no constitutional claim here notwithstanding Ruelas's argument that, in striking Margarita Ruelas's testimony, the trial court violated his constitutional rights to "a meaningful opportunity to present a complete defense with witnesses in a fundamentally fair trial." The exclusion of this improper impeachment evidence did not preclude Ruelas from presenting a defense. Nor did it prevent Ruelas from attacking Vanessa's credibility.

Even if the trial court erred, it is not reasonably probable the result would have been more favorable to Ruelas if the trial court had admitted Margarita Ruelas's testimony. (*People v. Paniagua* (2012) 209 Cal.App.4th 499, 524 [applying *People v. Watson* (1956) 46 Cal.2d 818 standard of harmless error where "'"there was no refusal to allow [defendant] to present a defense, but only a rejection of some evidence concerning the defense"'"].) Margarita's testimony that Vanessa shut the door in her face the first time she expressed disapproval of the relationship between Vanessa and Ruelas does not tend to establish a motive for Vanessa to fabricate a story, on or after August 5, 2010, that Ruelas beat her up and kidnapped her for the purpose of committing robbery.

## B. Instructions on count 3, kidnapping to commit robbery

Ruelas contends the trial court erred in giving incomplete instructions on count 3 for kidnapping to commit robbery. Ruelas argues the court should have instructed "sua sponte on the prosecution's burden to prove elementally that [Ruelas] did not actually and reasonably believe Vanessa consented to the movement."

The trial court instructed the jury with CALCRIM No. 1203 as follows:

"The defendants are charged in Count 3 with kidnapping for the purpose of robbery in violation of Penal Code section 209(b).

"To prove that a defendant is guilty of this crime, the People must prove that:

"1.     The defendant intended to commit robbery;

"2.     Acting with that intent, the defendant took, held or detained another person by using force or by instilling a reasonable fear;

"3.     Using that force or fear, the defendant moved the other person or made the other person move a substantial distance;

14

"4.    The other person was moved or made to move a distance beyond that merely incidental to the commission of the robbery;

"5.    When that movement began, the defendant already intended to commit robbery;

"AND

"6.    The other person did not consent to the movement.

"As used here, *substantial distance* means more than a slight or trivial distance. It must have substantially increased the risk of physical or psychological harm to the person beyond that necessarily present in the robbery. In deciding whether the movement was sufficient, consider all the circumstances relating to that movement.

"In order to *consent*, a person must act freely and voluntarily and know the nature of the act.

"To be guilty of kidnapping for the purpose of robbery, the defendant does not actually have to commit robbery.

"To decide whether the defendant intended to commit robbery, please refer to the separate instructions that I will give you on that crime.

"Defendant is not guilty of kidnapping if the other person consented to go with the defendant. The other person consented if she (1) freely and voluntarily agreed to go with or be moved by the defendant, (2) was aware of the movement, and (3) had sufficient mental capacity to choose to go with the defendant. The People have the burden of proving beyond a reasonable doubt that the other person did not consent to go with the defendant. If the People have not met this burden, you must find the defendant not guilty of this crime."

"A court has a sua sponte duty to charge the jury on the essential elements of the crime." (*People v. Eid* (2010) 187 Cal.App.4th 859, 878-879.) "[T]he lack of a defendant's reasonable belief in consent is an element of kidnapping for [robbery] *when suggested by the evidence*." (*Id*. at p. 878, italics added.) Thus, where there is sufficient evidentiary support, the trial court must instruct the jury "on the *conditional element* of

15

lack of reasonable belief in consent" and on the defense of reasonable belief in consent. (*Id*. at p. 879.)

Here, neither Ruelas nor Villa requested the trial court instruct the jury on the optional seventh element set forth in CALCRIM No. 1203, which provides: "7. The defendant did not actually and reasonably believe that the other person consented to the movement." Nor did either defendant request the court instruct the jury on the defense of reasonable belief in consent with the following optional portion of CALCRIM No. 1203: "The defendant is not guilty of kidnapping if (he/she) reasonably and actually believed that the other person consented to the movement. The People have the burden of proving beyond a reasonable doubt that the defendant did not reasonably and actually believe that the other person consented to the movement. If the People have not met this burden, you must find the defendant not guilty of this crime."

Ruelas's theory of the case below, as stated in his counsel's opening statement, was that Vanessa and Ruelas "were partying all night," and "after having used up all of Mr. Ruelas's money for the partying, they decided to get money from her EBT card so they can continue partying. Arriving at Walmart, she changed her mind that she didn't want to continue partying, and she didn't want to pay for the continued party and decided to make up this story." Ruelas's counsel also stated during opening statement that the reason Vanessa told Kosmatka (the Walmart cashier), "'I don't want to do this, not anymore,'" was "because she had consented to everything that happened until that point." As set forth above, there was no evidence presented at trial demonstrating Vanessa used drugs that morning or that Ruelas had ever paid for drugs for her. The only evidence regarding potential drug use by Vanessa was Esparza's testimony, summarized above, that Esparza saw Vanessa hide drugs and that Esparza saw Vanessa break a bowl on the ground that might have been used to smoke drugs. Esparza did not testify that she saw these things August 4-5, 2010.

Ruelas raised the defense of consent, not reasonable belief in consent. He asked the jury to find "that she's outright lying"—as his counsel stated during opening statement—about Ruelas beating her up, dragging her out of her apartment by her hair,

16

and threatening her with bodily harm while holding a screwdriver if she did not obey his commands when they went inside Walmart. The record is devoid of substantial evidence from which a rational jury could conclude that Vanessa did not consent to being taken to Walmart, *and* that Ruelas reasonably and actually believed that Vanessa consented to being taken to Walmart. Based on the evidence presented to the jury, either Ruelas forced Vanessa to go to Walmart against her will, or Vanessa willingly went to Walmart and then later fabricated a story about being forced to go to Walmart against her will. The evidence did not suggest Ruelas misinterpreted Vanessa's actions and reasonably and actually believed that she consented to being taken to Walmart.

Ruelas notes that at one point during the 911 call, Vanessa stated: "I told him [Ruelas] I wasn't gonna give him *his* -- the money cause that was my kids money for the rent and he just looked at me and he just walked out." (Italics added.) Vanessa consistently stated Ruelas forced her to go to Walmart for the purpose of forcing her to withdraw her cash for him. In fact, at the beginning of the 911 call, before she made the statement quoted above, Vanessa stated: "He made me come over here to Wal-Mart. . . . He was beating me up. He wanted me to give him *my cash . . . my money*, he made me come over here. . . ." (Italics added.) Kosmatka testified that, at the time Vanessa asked Kosmatka to dial 911, Vanessa told Kosmatka, "'he's trying to make me take my money out to give him.'" Vanessa's use of the word "his" during the 911 call does not tend to show Vanessa owed Ruelas money or had agreed to give him money, and therefore, Ruelas reasonably and actually believed Vanessa consented to being taken to Walmart.

Ruelas also points out that a video recording from Walmart shows Ruelas hugging Vanessa with his arm around her shoulder as they entered Walmart. Vanessa testified that she was pretending to be happy and was no longer crying as they entered Walmart. Ruelas further points out that Vanessa referred to Ruelas as her boyfriend during the 911 call. We do not find this—and the other evidence set forth above that Ruelas cites— sufficient to show Ruelas reasonably mistook Vanessa's actions for consent and actually believed she consented to being taken to Walmart. As the parties argued below, either Vanessa consented to the movement or she fabricated the story she told to Kosmatka, the

17

911 operator, law enforcement and the jury. Based on the evidence presented at trial, the court did not have a sua sponte duty to instruct the jury that the prosecution had to prove lack of Ruelas's reasonable belief in consent as an element of kidnapping to commit robbery in this case.

Even assuming the trial court erred, we would find the error harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Eid*, *supra*, 187 Cal.App.4th at p. 882 ["A trial court's failure to instruct on all elements of an offense is a constitutional error 'subject to harmless error analysis under both the California and United States Constitutions'"].) The jury saw photographic evidence of Vanessa's physical injuries and found Ruelas guilty of corporal injury to a former cohabitant. The jury also found Ruelas guilty of criminal threats and further found that Ruelas used a deadly and dangerous weapon when he made the criminal threats. Thus, the jury believed that Ruelas inflicted physical injures upon Vanessa and threatened to harm her further if she did not obey his commands. It is highly unlikely the jury would have found Ruelas reasonably and actually believed Vanessa consented to being taken to Walmart if the trial court had instructed the jury with the optional portions of CALCRIM No. 1203 quoted above.

**C. Absence of instruction on attempted kidnapping to commit robbery**

Ruelas contends the trial court erred in not instructing sua sponte on attempted kidnapping to commit robbery, a lesser included offense of kidnapping to commit robbery.

"'Under California law, a lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser.' [Citation.]" (*People v. Breverman* (1998) 19 Cal.4th 142, 154, fn. 5.) A trial court errs if it fails to instruct "on all theories of a lesser included offense which find substantial support in the evidence. On the other hand, the court is not obliged to instruct on theories that have no such evidentiary support." (*Id.* at p. 162.) "[T]he existence of '*any* evidence, no matter how

weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.] 'Substantial evidence' in this context is '"evidence from which a jury composed of reasonable [persons] could . . . conclude"' that the lesser offense, but not the greater, was committed. [Citations.]" (*Ibid.*)

In this case, the trial court instructed the jury on kidnapping to commit robbery and also the lesser included offense of simple kidnapping. Neither Ruelas nor Villa requested instructions on attempted kidnapping to commit robbery and the court did not instruct the jury on this crime.

Attempted kidnapping to commit robbery is a lesser included offense of kidnapping to commit robbery. (*People v. Mullins* (1992) 6 Cal.App.4th 1216, 1221.) As discussed above, a conviction for kidnapping to commit robbery requires proof that the movement of the victim was beyond that merely incidental to the commission of the robbery and substantially increased the risk of harm beyond that necessarily present in the robbery. (CALCRIM No. 1203.) A conviction for attempted kidnapping to commit robbery requires proof "the defendant had the specific intent required for kidnapping to commit robbery and the movement, *if completed as the defendant intended*, would have been more than merely incidental to the underlying crime of robbery and would have substantially increased the risk of harm over and above that necessarily present in the robbery." (*People v. Mullins*, *supra*, 6 Cal.App.4th at p. 1221, italics added.) Thus, a conviction for attempted kidnapping to commit robbery is proper where the defendant's "intent was to move [the victim] much farther and that he was prevented from doing so only by her successful escape." (*Id.* at pp. 1220-1221.)

There is no evidence in the record indicating Ruelas intended to move Vanessa farther than he did, and Ruelas does not argue otherwise on appeal. Thus, instructions on attempted kidnapping to commit robbery were not warranted.

What Ruelas argues is that the evidence did not establish the movement was beyond that merely incidental to the commission of the robbery and substantially

19

increased the risk of harm beyond that necessarily present in the robbery. This suggests a challenge to the sufficiency of the evidence supporting the conviction for kidnapping to commit robbery, not an argument in support of instructions on the lesser included offense of attempted kidnapping to commit robbery.

To the extent Ruelas is challenging the sufficiency of the evidence establishing the movement was beyond that merely incidental to the commission of the robbery and substantially increased the risk of harm beyond that necessarily present in the robbery, we reject his challenge. Substantial evidence demonstrated Ruelas dragged Vanessa by her hair from her apartment and led her to another building in her apartment complex. Then Ruelas forced Vanessa into the back of a van driven by another man and threatened her with a screwdriver as Villa drove to a location where Vanessa could withdraw money from her account. Moving Vanessa from one apartment building to another was movement beyond that merely incidental to the commission of the robbery. Dragging Vanessa by her hair to Monique and Huero's apartment to find Villa and forcing Vanessa into the back of a van parked in an alley substantially increased the risk of harm beyond that necessarily present in the robbery.

## II. Petition for Writ of Habeas Corpus (B251018)

"To satisfy the initial burden of pleading adequate grounds for relief, an application for habeas corpus . . . should both (i) state fully and with particularity the facts on which relief is sought [citations], as well as (ii) include copies of reasonably available documentary evidence supporting the claim, including pertinent portions of trial transcripts and affidavits or declarations. [Citations.]" (*People v. Duvall* (1995) 9 Cal.4th 464, 474.) "An appellate court receiving such a petition evaluates it by asking whether, assuming the petition's factual allegations are true, the petitioner would be entitled to relief." (*Id.* at pp. 474-475.) "'Conclusory allegations made without any explanation of the basis for the allegations do not warrant relief, let alone evidentiary hearing.' [Citation.] We presume the regularity of proceedings that resulted in a final judgment [citation], and . . . the burden is on the petitioner to establish grounds for his release. [Citations.]" (*Id.* at p. 474.) If the petitioner states a prima facie case for relief,

20

the court will issue an order to show cause. (*Id*. at p. 475.) For the reasons set forth below, we conclude Ruelas has not stated a prima facie case for relief on any of his claims. Therefore, we have not issued an order to show cause.

### A. Claim of jury misconduct

In support of his petition for writ of habeas corpus, Ruelas submitted, among other things, a declaration from his trial attorney, Marjorie Barrios, stating:

"On the day that Ramon Ruelas was convicted by the jury, I approached the jurors outside the courtroom to ask them why they found the way they did. I walked down the hall with them and rode the elevator with I think 11 of the jurors, one (a black Female juror) had left a few minutes before the others. I asked the jurors, 'Why did you think he was guilty?' One juror, the foreman, answered, 'If he was innocent he should have taken the stand. If I was innocent I would be jumping up and down claiming my innocence.' All the other jurors in the elevator agreed with him by nodding their head in a yes, 'up and down' motion. I asked a female juror, 'Do you agree with him?' She said, 'Yes.' They basically said that they convicted Ramon Ruelas because he did not take the stand to assert his innocence."

Barrios signed this declaration on April 1, 2012. She did not file a motion for new trial on Ruelas's behalf. The trial court sentenced Ruelas in this matter a couple of weeks later on April 18, 2012. Barrios did not submit a later declaration in support of Ruelas's petition for writ of habeas corpus.

Based on Barrios's declaration—and the August 2013 declarations of Ruelas, his sister, his brother-in-law, his father, his mother, and his appellate counsel, repeating the statements in Barrios's declaration—Ruelas claims the jury committed misconduct in discussing and drawing adverse inferences of guilt from Ruelas's exercise of his constitutional right not to testify. Ruelas has not stated a prima facie case for relief on his claim for jury misconduct.

A jury commits misconduct when it discusses a defendant's failure to testify. (*People v. Avila* (2009) 46 Cal.4th 680, 727.) As the trial court instructed the jury in this case, "A defendant has an absolute constitutional right not to testify. He or she may rely

on the state of the evidence and argue that the People have failed to prove the charges beyond a reasonable doubt. Do not consider, for any reason at all, the fact that a defendant did not testify. Do not discuss that fact during your deliberations or let it influence your decision in any way." (CALCRIM No. 355.)

The declarations Ruelas submitted are not sufficient support for his claim of jury misconduct. "[P]roperly executed juror affidavits are required to establish jury misconduct . . . ." (*People v. Bryant* (2011) 191 Cal.App.4th 1457, 1468.) Hearsay is not proper support. (*Ibid*.) Ruelas has not submitted any juror affidavits or declarations.

Even if the juror statements in Barrios's declaration were admissible, which they are not, they do not establish a prima facie case of jury misconduct.[11] The declaration does not show that any juror commented on Ruelas's failure to testify during deliberations. Moreover, the juror statements are not specific enough to show that consideration of Ruelas's failure to testify caused actual harm to Ruelas. (*People v. Avila, supra,* 46 Cal.4th at p. 726 [this type of jury "'misconduct gives rise to a presumption of prejudice, which "may be rebutted . . . by a reviewing court's determination, upon examining the entire record, that there is no substantial likelihood that the complaining party suffered actual harm"'"].) The statements in the declaration do not support the conclusory allegations in Ruelas's petition that the "jurors violated the court's instructions, considered petitioner's silence as guilt, discussed petitioner's silence during their deliberations, unconstitutionally drew adverse inferences of guilt, and committed juror misconduct."

---

[11] In his informal reply brief in support of his petition, Ruelas argues that the juror statements in trial counsel's declaration constitute "admissible hearsay" because they are declarations against interest, spontaneous statements and prior inconsistent statements. We disagree with Ruelas's arguments, and find that the statements are hearsay, but we need not address the issue further because the statements are not sufficient to state a claim of jury misconduct in any event.

22

## B.  Ineffective assistance of counsel claim

Ruelas also claims his trial counsel, Barrios, rendered ineffective assistance in not filing a motion for new trial based on a claim of jury misconduct.

On February 23, 2012, Barrios requested the trial court continue sentencing "for the purpose of exploring a possible motion for new trial."  The court continued the matter to April 18, 2012.  On April 1, 2012, Barrios signed the declaration quoted above. According to the declaration of Lucia Elias, Ruelas's sister, submitted in support of this petition, Barrios forwarded her April 1, 2012 declaration to Elias before the continued sentencing hearing and told Elias to give the declaration to Ruelas's appellate counsel. Barrios filed a sentencing memorandum on April 18, 2012, and the court sentenced Ruelas the same day.  Barrios did not file a motion for new trial.

The August 2013 declarations of Ruelas, his sister, his brother-in-law, his father, his mother, and his appellate counsel, submitted in support of this petition, state that Barrios refused to file a motion for new trial because Ruelas's family was unable to pay the additional funds she required in order to proceed with a motion for new trial.  Barrios did not submit a declaration explaining why she did not file a motion for new trial. Ruelas submitted with this petition the "Attorney-Client Fee Agreement" signed by his father and Barrios, which provides, in pertinent part:  "This agreement covers Jury Trial services only and no appellate work."

"'To establish ineffective assistance of counsel, a [defendant] must demonstrate that (1) counsel's representation was deficient in falling below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient representation subjected the [defendant] to prejudice, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the [defendant]. [Citations.]  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." [Citation.]' [Citation.]"  (*In re Jones* (1996) 13 Cal.4th 552, 561.)

Ruelas has not stated a prima facie case for relief on his ineffective assistance of counsel claim because he cannot show prejudice.  The allegations of the petition and

23

attached exhibits do not show there is a reasonable probability the result would have been more favorable to Ruelas if Barrios had filed a motion for new trial based on a claim of jury misconduct. As discussed above, the conclusory allegations of the petition and the declarations do not show jury misconduct.

### C. Attorney conflict of interest

Ruelas claims his trial counsel, Barrios, had an actual conflict of interest in that "[h]er self-interest for additional money conflicted with [Ruelas]'s legal interest to have the new trial motion prepared, filed, and pursued." Ruelas asserts his constitutional rights were violated as a result of Barrios's actual conflict of interest.

Ruelas has not stated a prima facie case for relief on this conflict of interest claim. He cannot show prejudice, for the reasons already discussed above. To prevail on this claim, he must demonstrate there is a reasonable probability the result would have been more favorable to him if Barrios had filed a motion for new trial based on a claim of jury misconduct. (*People v. Doolin* (2009) 45 Cal.4th 390, 428-430.)

### D. Right to counsel of choice

Ruelas claims he "was denied his right to counsel of choice, including his right to discharge retained counsel." "[T]he right to counsel of choice reflects not only a defendant's choice of a particular attorney, but also his decision to discharge an attorney whom he hired but no longer wishes to retain." (*People v. Ortiz* (1990) 51 Cal.3d 975, 983.)

In support of this claim, Ruelas asserts he "did not understand and was not advised that counsel had a conflict of interest. [He] was not advised that his right to retained counsel included his right to discharge retained counsel and have an attorney appointed. Had [he] so understood and been so advised he would have discharged retained counsel and obtained appointed counsel."

As the appellate record in this matter demonstrates, Ruelas never informed the trial court he wanted to file a motion for new trial, but Barrios refused to file one on his behalf because he could not afford to pay her. He was aware of the problem but did not bring it to the trial court's attention. The Attorney-Client Fee Agreement he attached to

24

this petition states, "Client may discharge Attorney at any time." Ruelas did not inform the trial court he wanted to discharge his attorney or ask the court what his options were if he discharged his attorney. Ruelas has not stated a prima facie case for relief on his claim for denial of his right to discharge his retained counsel.

## DISPOSITION

The judgment is affirmed. The petition for writ of habeas corpus is denied.

NOT TO BE PUBLISHED.


CHANEY, J.

We concur:


ROTHSCHILD, Acting P. J.


JOHNSON, J.